UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION

MARSHMELLO CREATIVE, LLC, etc., )
et al.,                          )
                                 )
        Plaintiffs,              )
                                 )  Case No. 2:23-cv-7345
  vs.                            )  SVW (MRWx)
                                 )
THOMAS HOEFER, et al.,           )
                                 )
        Defendant.               )
_____)

VIDEOTAPED DEPOSITION OF

CHRISTOPHER COMSTOCK

VOL 1 - pages 1 to 108

Thursday, May 16, 2024

10:40 a.m.

STENOGRAPHICALLY REPORTED BY:

JESSICA LOBATO, CSR 14478

JOB NO. 98475

## Page 2

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA WESTERN DIVISION
 3
 4
 5
 6   MARSHMELLO CREATIVE, LLC, etc., )
     et al.,                        )
 7                                  )
         Plaintiffs,                )
 8                                  )
     vs.                            )  Case No.  2:23-cv-7345
 9                                  )  SVW (MRWx)
     THOMAS HOEFER, et al.,         )
10                                  )
         Defendant.                 )
11   _____)
12
13
14
15
16        VIDEOTAPED DEPOSITION OF CHRISTOPHER COMSTOCK,
17   taken before JESSICA LOBATO, CSR No. 14478, a Certified
18   Shorthand Reporter for the State of California, with
19   principal office in the County of Orange, commencing on
20   Thursday, May 16, 2024, at 10:40 a.m., at 350 South Grand
21   Avenue, Suite 3100, Los Angeles, California 90071.
22
23
24
25
```

## Page 3

```
 1   APPEARANCES OF COUNSEL:
 2
     For the Plaintiffs:
 3
             DAVIS WRIGHT TREMAINE, LLP
 4           BY:  Peter J. Anderson, Esq.
             865 South Figueroa Street
 5           Suite 2400
             Los Angeles, California 90017
 6           (310) 260-6030
             peteranderson@dwt.com
 7
 8   For the Defendants:
 9       FOSTER LAW GROUP
             BY:  Brian Foster, Esq.
10           4402 North 36th Street
             Suite 127
11           Phoenix, Arizona 85018
             (602) 509-7345
12           brian@fosterlawgrp.com
13
14   ALSO PRESENT:
15           Samantha Krasner, Videographer
             Josh Binder, Esq.
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   I N D E X
 2   EXAMINATION                                      PAGE
 3   By Mr. Foster                                     7
 4
 5
 6
 7
 8               E X H I B I T S
 9
10   DEFENDANTS'      DESCRIPTION                     PAGE
11   Exhibit 1   Confidentiality and non-disclosure   46
                 agreement; 4 pages
12
     Exhibit 2   Release agreement; 5 pages           46
13
14
15
16
17        QUESTIONS INSTRUCTED NOT TO ANSWER
18              PAGE 24  LINE  2
19              PAGE 41  LINE 12
20              PAGE 99  LINE  7
21              PAGE 99  LINE 14
22              PAGE 99  LINE 20
23              PAGE 100 LINE 19
24              PAGE 101 LINE  4
25
```

## Page 5

```
 1                   I N D E X
                   (Continued)
 2
 3
 4   TRANSCRIPT MARKED AT THE REQUEST OF COUNSEL
 5              PAGE 79  LINE 24
 6   PAGE 77  LINE 11 to PAGE 80 LINE  1
 7              PAGE 107  LINE  4
 8
 9
10
11          INFORMATION REQUESTED
12                  None
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CHRISTOPHER COMSTOCK, VOLUME I

**May 16, 2024**

Page 6

1          Los Angeles, California;
2          Thursday, May 16, 2024
3              10:40 a.m.
4              --oOo--
5          THE VIDEOGRAPHER:  We are now on the record.  This
6    is the beginning of media number one in the deposition of
7    Christopher Comstock in the matter of Marshmello Creative,
8    LLC vs. Thomas Hoefer, case no. 2:23-cv-7345 SVW(MRWx) held
9    at 350 South Grand Avenue, Los Angeles, California.  This
10   deposition is being taken on behalf of the plaintiff [sic]
11   on May 16th, 2024, at 10:40 a.m.
12         The court reporter is Jessica Lobato.  I'm
13   Samantha Krasner, the videographer on behalf of First Legal
14   Depositions located in Los Angeles, California.  This
15   deposition is being videotaped at all times unless
16   specified to go off the video record.  Will all present
17   please identify themselves beginning with the noticing
18   attorney.
19         MR. FOSTER:  Good morning.  My name is Brian
20   Foster, and I'm here on behalf of Thomas Hoefer.
21         MR. ANDERSON:  Good morning.  Peter Anderson of
22   Davis Wright Tremaine on behalf of the plaintiffs.
23         MR. BINDER:  Good morning.  Joshua Binder,
24   Rothenberg, Mohr & Binder, on behalf of Christopher
25   Comstock.

Page 7

1          THE VIDEOGRAPHER:  Will the court reporter please
2    swear in the witness.
3          THE COURT REPORTER:  Good morning.  My name is
4    Jessica Lobato.  I am a California Certified Shorthand
5    Reporter and the deposition officer for today's deposition.
6    My CSR license number is 14478.  I am a code compliant
7    reporter.
8
9              CHRISTOPHER COMSTOCK,
10   called as a witness, having been first duly sworn, was
11   examined and testified as follows:
12
13
14              E X A M I N A T I O N
15   BY MR. FOSTER:
16      Q.  Please state your full name.
17      A.  Christopher Comstock.
18      Q.  Now, Mr. Comstock, my name is Brian Foster.  We
19   met briefly before your deposition.  I'm here representing
20   the interest of Thomas Hoefer.  I appreciate you showing up
21   here today.
22         Let's start by asking have you given a deposition
23   before?
24      A.  Yes.
25      Q.  How many times?

Page 8

1      A.  Once.
2      Q.  Okay.  What kind of a case was that?
3      A.  I don't know how to answer that.
4      Q.  Were you suing somebody?  Did somebody sue you?
5      A.  Somebody was suing me.
6      Q.  Okay.  Were they suing you personally or your
7    companies?
8      A.  I don't remember the specifics.
9      Q.  Okay.  Did the case go to trial?
10     A.  I don't -- I don't -- no.  I'm not sure.
11     Q.  Okay.  Did you testify just at your deposition or
12   did you show up at trial in a courtroom and testify?
13     A.  Just in a deposition.
14     Q.  Okay.  Did the case settle?  Are you familiar with
15   that term?
16     A.  Yes.  But I'm not sure.
17     Q.  Is the case still going on?
18     A.  No.
19     Q.  Did you win the case?
20     A.  Yes, I believe.
21     Q.  Okay.  And who was the other party?
22     A.  Another musical artist.
23     Q.  Was it -- was this the Arty lawsuit?
24     A.  Yes.
25     Q.  Okay.  And how long ago was that?

Page 9

1      A.  I can't remember.
2      Q.  Maybe in the last two, three years?
3      A.  Yes.  I'm not completely sure.  Last three years.
4      Q.  And where was the case?  In Los Angeles or where
5    was it?
6      A.  It was during COVID; so it was on the computer.
7      Q.  Okay.  And just one last question.
8          Do you know if the judge made a decision in your
9    favor or if the parties reached an agreement to walk away?
10     A.  I don't remember the specifics of that.
11     Q.  Okay.  Do you think you won?
12     A.  No.  I mean, yes.
13     Q.  Okay.  Winning is good; right?
14     A.  Sure.
15     Q.  Okay.  So you've only been deposed or given a
16   deposition one time.  So I'll just take a second and go
17   through kind of, you know, deposition 101, if you don't
18   mind.
19         I'm going to ask you a series of questions.
20   Unless your lawyer, Mr. Anderson, instructs you not to
21   answer a question, you are to proceed and answer the
22   question.
23         Do you understand that?
24     A.  Yes.
25     Q.  And if you do not understand any question I ask,

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

Page 10

1  let me know.  If you don't let me know, then I'm going to
2  assume you understand the question.
3          Is that fair enough?
4      A.  Yes.
5      Q.  And we need to make sure that we're creating a
6  clean record for Jessica, the court reporter.  She's the
7  most important person here.  So, you know, a lot of the
8  conversational things where we nod heads and "mm-hmm,"
9  "uh-huh," they don't translate very good when she's trying
10  to be very accurate.  So let's both try to make her job
11  easier.
12          Does that seem fair?
13      A.  Sure.
14      Q.  Okay.  Are you -- are you married?
15      A.  No.
16      Q.  Okay.  Do you have kids?
17      A.  No.
18      Q.  How old are you?
19      A.  31.
20      Q.  Okay.  What's your date of birth?
21      A.  May 19th, 1992.
22      Q.  Have you ever been convicted of any crimes?
23      A.  No.
24          THE VIDEOGRAPHER:  I'm sorry.  I'm having some
25  camera problems.  Can we go off the record for one second?

Page 11

1          MR. FOSTER:  You wanna do what?
2          THE VIDEOGRAPHER:  I'm having an issue with my
3  camera.  Can we go off the record for one second?
4          MR. FOSTER:  Yeah.
5          THE VIDEOGRAPHER:  The time is 10:45, and we're
6  going off the record.
7          (Pause in proceedings.)
8          THE VIDEOGRAPHER:  The time is 10:48 a.m.  We're
9  back on the record.
10  BY MR. FOSTER:
11      Q.  Mr. Comstock, throughout the deposition is it okay
12  if I refer to you as Mr. Comstock or Chris?
13      A.  Sure.  Either one.
14      Q.  Okay.  You said that you were not married.  You
15  didn't have kids.  You were 31 years of age, and you've not
16  been convicted of a felony; is that correct?
17      A.  Correct.
18      Q.  Okay.  Where do you live?
19      A.  In Hollywood, California.
20      Q.  Did you graduate from high school?
21      A.  Yes.
22      Q.  Where did you go to high school?
23      A.  In Philadelphia.  The Shipley School.
24      Q.  What kind of a school?
25      A.  Shipley is the name of the school.

Page 12

1      Q.  Oh, Shipley.  What city?  Oh, in Philly.
2      A.  In Philly.  The suburbs.
3      Q.  Okay.  Okay.
4          Did you -- did you attend school after high
5  school?
6      A.  Yes.
7      Q.  Where did you go to college?
8      A.  Saint Joe's University.  Also in Philadelphia.
9      Q.  Okay.  Did you graduate?
10      A.  Yes.
11      Q.  What -- what degree?
12      A.  It's called business intelligence.  It's like
13  statistics.
14      Q.  Hey, that's an oxymoron.
15      A.  Business.  Yeah, business intelligence.
16      Q.  It's -- but it's the study of statistics.
17          So it's in the business college?
18      A.  Yes.
19      Q.  Okay.  And what year did you graduate from Saint
20  Joe's?
21      A.  2014.
22      Q.  Okay.  And did you do any schooling after you got
23  out of Saint Joe's?
24      A.  No.
25      Q.  Did you -- have you ever received any specialized

Page 13

1  training other than what you did at Saint Joe's?
2      A.  No.
3      Q.  Okay.  Do you have any formal musical training or
4  anything of that nature?
5      A.  No.
6      Q.  Did you start performing, like, at a young age or
7  when did you start doing your thing?
8      A.  I started performing music, maybe piano recitals
9  when I was younger.  Nine, eight.
10      Q.  Okay.  What about -- what about performing in
11  venues and things of that nature?  When did you start doing
12  that?  DJ'ing or parties or things like that?
13      A.  I started -- I played my first venue when I was
14  22.  I can't remember specifically.
15      Q.  So that would be, like, right after college?
16      A.  Right after college.
17      Q.  Okay.  Now, your transactional attorney that I met
18  earlier, Josh Binder, is here today; correct?
19      A.  Correct.
20      Q.  And does Mr. Binder handle your intellectual
21  property portfolio?
22      A.  I'm not sure I understand exactly.
23      A.  Yeah.  Like copyrights and trademarks and stuff
24  like that.
25      A.  Yes.

**Page 14**

1    Q. Okay. And so if I was to ask you for an inventory
2  of different intellectual property, copyrights that you
3  had, would you turn around and contact Mr. Binder?
4      **A. Yes.**
5    Q. Okay. Now, you did your first, I guess, event
6  when you were about 22.
7        Is that what you said?
8      **A. Yes. I can't remember specifically.**
9    Q. Yeah. Yeah. At this stage I'm not going to --
10  I'm not looking for specificity. Later I will. Right now
11  I'm not.
12        So did you -- did you start working at KPMG?
13     **A. No.**
14    Q. Like -- when I walked in you were talking about an
15  accounting firm or something like that, and I did my
16  undergrad in business in accounting. So I interviewed with
17  them back when they were the big eight --
18     **A. Mm-hmm.**
19    Q. -- before they sued -- the lawyers sued them out
20  of existence.
21     **A. Mm-hmm.**
22    Q. Did you -- did you work in a non-music position
23  after you got out of college?
24     **A. No.**
25    Q. Okay. How did you get started? 22 years old,

**Page 15**

1  graduated. Got a nice degree from a private school.
2        How did you get going?
3      **A. I was in bands that never really took off playing**
4  **rock music, and at the time electronic music was getting**
5  **big. So I figured why have a whole band when it could be**
6  **just me producing the music by myself.**
7    Q. So did you -- did you -- from day one after the
8  band thing get into EDM?
9      **A. Yes. That -- that was when I started producing my**
10  **own music, it was electronic music.**
11    Q. Yeah. But the band stuff, like you said, was like
12  rock-and-roll and classic --
13     **A. Yes.**
14    Q. -- and everything; right?
15     **A. Yes.**
16    Q. Okay. What was your big break? What happened?
17  Because a lot of people don't ever get a break.
18        What happened for you?
19     **A. I made one song named Alone, and the music video**
20  **did pretty well, and I would say -- if you're asking me to**
21  **choose a break point --**
22    Q. Yeah.
23     **A. -- to my best ability I would say that is.**
24    Q. And what year was that, roughly?
25     **A. 2016.**

**Page 16**

1    Q. Now, at the time were you signed with Red Light
2  Entertainment at that time?
3      **A. I can't remember specifically.**
4    Q. Okay. But that's in the timeframe when you were
5  working with Mr. Shalizi at Red Light?
6      **A. Yes.**
7    Q. Because my understanding is that you were working
8  with Red Light as a management group, and then Mr. Shalizi
9  started his own group -- or his own company and you moved
10  at some point to the Shalizi Group; right?
11     **A. Yes.**
12    Q. And just a matter of when that happened time-wise,
13  right, or you don't know?
14     **A. I'm not sure.**
15    Q. Okay. When you moved from Red Light Entertainment
16  to the Shalizi Group, was there any controversy with Red
17  Light about you moving over to the Shalizi Group?
18     **A. Not that I'm aware of. I don't recall.**
19    Q. Okay. You didn't have any kind of restrictive
20  language that tied you to Red Light, and they didn't put up
21  a fuss about you -- you know, one of their golden children
22  going to a competitor?
23     **A. I don't recall.**
24    Q. Was -- was Red Light the first -- I'm gonna call
25  it a management company that you signed with?

**Page 17**

1      **A. No.**
2    Q. Who were you with first?
3      **A. Still with Moe Shalizi at Buygore --**
4        (Unreportable simultaneous talking.)
5    Q. B-i --
6      **A. B-u-y-g-o-r-e.**
7    Q. B-u --
8      **A. u-y --**
9    Q. -- b-u-y, as in --
10     **A. -- y --**
11    Q. -- g-o-r?
12     **A. g-o-r-e.**
13    Q. Okay. Okay.
14        And so Moe was at that company?
15     **A. Yes.**
16    Q. And then you moved from Buygore to Red Light;
17  right?
18     **A. Yes.**
19    Q. With Moe also?
20     **A. Yes.**
21    Q. And then you're currently being managed by the
22  Shalizi Group?
23     **A. Yes.**
24    Q. How did you find Moe Shalizi initially when --
25  when you signed with Buygore?

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 18

1    A.  Moe reached out to me via Twitter and expressed
2    interest, and I signed a contract with them.
3        Q.  Do you remember about when that was?
4        A.  It would have been the summer of 2014.
5        Q.  That'd be a pretty exciting time for you?
6        A.  Yeah.
7        Q.  Did you have an agent or anything like that back
8    then?
9        A.  I don't recall exactly when I signed to an agent.
10       Q.  Okay.  Who is your agent or agency?
11       A.  Back then it was -- it would have been Circle
12   Talent Agency.
13       Q.  Okay.  And do you have an agent now?
14       A.  I do.
15       Q.  Who is that?
16       A.  I forget his exact name but it's at Wasserman.
17       Q.  At the Wasserman --
18       A.  Wasserman Agency.
19       Q.  Wasser --
20       A.  There's -- there's multiple agents that work.  So
21   to designate one is hard to remember for me.
22       Q.  Okay.  Who do you think is, like, the lead person
23   on your account?
24       A.  This guy named Sam.
25       Q.  Sam?

Page 19

1        A.  Mm-hmm.
2        Q.  Okay.  Do you remember his last name?
3        A.  I'm blanking on his last name.
4        Q.  Okay.  Now, we talked briefly about the lawsuit
5    involving -- I'll call it Arty -- is that A-r-t-i-e?
6        A.  "Y."
7        Q.  A-r-t-y?
8        A.  Yes.
9        Q.  Are you aware, as you sit here today, of any other
10   lawsuits that Marshmello Creative or 365 Touring or Chris
11   Comstock have been involved in?
12       A.  No.
13       Q.  Now, you worked with Thomas Hoefer for about seven
14   or eight years; is that right?
15       A.  That sounds about right.
16       Q.  And you would agree with me that Mr. Hoefer is
17   a top-notch VJ?
18       A.  He was my VJ, yes.
19       Q.  Yeah.  And you would agree that he was good at
20   what he did?  He worked with you for seven years; right?
21       A.  I would agree he was sufficient, yes.
22       Q.  Okay.  You considered him a good friend at the
23   time, didn't ya?
24       A.  There was a time.
25       Q.  Okay.  And -- well, there was a time, that time

Page 20

1    just ended, like, in 2023; right?
2        A.  Yes.
3        Q.  So he was a good friend for about seven years;
4    right?
5        A.  Yes.
6        Q.  Did you used to tell him he was a great VJ?
7        A.  I don't recall specifically saying that.
8        Q.  You came in here today and said he was sufficient.
9    There was a period of time when you thought he was doing a
10   great job in building your brand, wasn't there?
11       A.  I don't understand the question.
12       Q.  Sure.  He worked with you for seven years.  He did
13   hundreds of shows with you.
14           If he wasn't doing a good job, wouldn't you have
15   replaced him a long time ago?
16       A.  I suppose.
17       Q.  Okay.  So I understand -- I need you to -- I need
18   you to separate, if you can, how you feel today about
19   Mr. Hoefer from how you felt about him for the last seven
20   years before he was fired.
21           Can you do that?
22           MR. ANDERSON:  Objection.  Argumentative.  Assumes
23   he didn't have the same feelings from the beginning.
24           MR. FOSTER:  Can you -- can you do that?
25           THE WITNESS:  Can I answer that?

Page 21

1            MR. ANDERSON:  If you understand the question.
2            MR. FOSTER:  Yeah.  He didn't tell you not to
3    answer --
4            THE WITNESS:  Okay
5            MR. FOSTER:  -- so you always have to answer.
6            THE WITNESS:  Okay.
7            MR. FOSTER:  I'll start over.
8            THE WITNESS:  Yeah.  Rephrase, please.
9    BY MR. FOSTER:
10       Q.  So from 2015 until sometime in 2023, did you think
11   that Mr. Hoefer was a very good VJ?
12       A.  Yes.
13       Q.  Okay.  And from that same period of time, did you
14   consider him a good friend?
15       A.  Yes.
16       Q.  You thought he was talented; right?
17       A.  Yes.
18       Q.  And he was, you know, well regarded in the
19   industry as a VJ?
20       A.  Yes.
21       Q.  And he was there with you, not from the beginning,
22   but from the pretty early stages, wasn't he?
23       A.  Yes.
24       Q.  And would you agree that some of the work he did
25   helped you build your brand?

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 22

1    A.  I wouldn't completely agree.
2    Q.  Okay.  Would you agree that he had some part in
3  helping you and your team build the Marshmello brand?
4    A.  I still don't completely agree with building the
5  brand.  He was -- he worked -- he did shows with me.
6    Q.  Okay.  Would you agree that live performances are
7  a big part of what you're known for?
8    A.  Yes.
9    Q.  And would you agree that the energy created by
10  what you do on stage and with all the visual effects going
11  on around you is part of your attraction in your show?
12    A.  Yes.  Part of the show, yes.
13    Q.  Yeah.  And would you agree that Mr. Hoefer had a
14  lot to do with the videos and visual media that was shown
15  during these amazing shows that you put on?
16    A.  He ran the visual for the shows, yes.
17    Q.  Yeah.  I mean, if -- if he wasn't running them,
18  there wouldn't be visuals; right?
19    A.  That's not true -- necessarily true.
20    Q.  Well, if he wasn't plugging in data or media,
21  would there be a period of time where nothing was being
22  shown?
23    A.  You could automate that, but I guess for those
24  specific shows, yes.  He was responsible for projecting the
25  visuals up onto the LED screen.

Page 23

1    Q.  Yeah.  And you didn't have a backup that would
2  instantly kick in if he wasn't projecting on the screen,
3  did ya?
4    A.  No backup.
5    Q.  Okay.  So if he wasn't doing his job, you'd have a
6  dark screen?
7    A.  Yes.
8    Q.  So would you agree with me after all of that that
9  he had some part in helping you become as popular as you
10  are today?
11    A.  Yes.
12    Q.  Who did you meet with to prepare for your
13  deposition?
14    A.  My lawyers.
15    Q.  Both -- the two attorneys here today, Mr. Anderson
16  and Mr. Binder?
17    A.  Yes.
18    Q.  Okay.  And when did you meet with them?
19    A.  Yesterday.
20    Q.  Okay.  And where did you meet at?
21    A.  Via Zoom.
22    Q.  Okay.  And how long did you do your Zoom prep?
23  How many hours?
24    A.  Maybe 45 minutes.
25    Q.  Okay.  Did you look at any documents?

Page 24

1    A.  No.
2    Q.  Did you talk about some documents?
3    MR. ANDERSON:  Objection.  Attorney/client
4  privilege.  Instruct him not to answer.
5  BY MR. FOSTER:
6    Q.  Did you look at any documents?
7    MR. ANDERSON:  You asked him that.  It's asked and
8  answered.
9  BY MR. FOSTER:
10    Q.  I didn't hear.
11    Did you look at any documents --
12    A.  No.
13    Q.  -- during this phone call with your attorneys?
14    A.  No.
15    Q.  Have you looked at any documents in this case?
16  There's been a lot of papers filed, and you've verified
17  some stuff indicating that you've reviewed it.
18    Have you reviewed some documents in this case?
19    A.  Yes.
20    Q.  Okay.  Do you remember what kinds of things you've
21  reviewed?
22    A.  I don't recall.
23    Q.  When you reviewed documents, do you recall signing
24  a verification acknowledging that you've read it and that
25  the stuff in the document is accurate?

Page 25

1    A.  I don't recall specifically.
2    Q.  Okay.  Well, I'll show you that here in a couple
3  of seconds.  Actually, maybe I'll just do that now just to
4  kind of get that moving.  Well, I'll dig that at a break.
5    You've -- your attorney or somebody had you
6  signing verifying the accuracy of some pretty important
7  documents that have been filed in this case.
8    Would you have reviewed those documents carefully
9  before acknowledging in your signature that the information
10  was accurate?
11    A.  Yes.
12    Q.  So other than meeting with your two attorneys
13  yesterday, have you done anything else to get ready for
14  this deposition?
15    A.  No.
16    Q.  To the best of your knowledge, Mr. Hoefer didn't
17  have any kind of a written employment contract with the
18  plaintiffs; correct?
19    A.  I wouldn't know.
20    Q.  Well, you're the -- you're the managing member of
21  Marshmello Creative, aren't ya?
22    A.  Yes.
23    Q.  And are you also a significant shareholder at 365
24  Touring?
25    A.  Yes.

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 26

1    Q.  And you've prepared for this deposition with your
2  attorney; right?
3    **A.  Yes.**
4    Q.  And your sworn testimony is that you don't know
5  whether the person you sued had any kind of a written
6  contract with Marshmello Creative, your company, or with
7  365 Touring; is that your testimony?
8    **A.  My testimony is my manager handles all of that.**
9  **He would know.**
10    Q.  Who's your manager?
11    **A.  Moe Shalizi.**
12    Q.  Do you know whether Mr. Hoefer -- do you have --
13  strike that.
14    So you don't have any opinion on whether
15  Mr. Hoefer was an employee or an independent contractor?
16    **A.  I would say he was an employee.**
17    Q.  Okay.  And my question is:  Did he have a written
18  employment agreement?
19    MR. ANDERSON:  Objection.  Asked and answered.
20  Looking at him sternly is not gonna change --
21    MR. FOSTER:  Hey.  Hey.  Hey.
22    MR. ANDERSON:  -- his answer.
23    MR. FOSTER:  Did you hear the judge say not to
24  give speaking objections because I'm gonna get him on the
25  phone quick.  I'm not putting up with any of your crap.  Do

Page 27

1  you understand me?  I let you go the first time.  No
2  speaking objections.
3    MR. ANDERSON:  I'm just pointing out --
4    MR. FOSTER:  Okay.
5    (Unreportable simultaneous talking.)
6    MR. ANDERSON:  -- that staring at him --
7    MR. FOSTER:  Okay.
8    MR. ANDERSON:  -- aggressively is not going to
9  change his testimony.
10    MR. FOSTER:  And you trying to make a false record
11  is not anything that I would expect of an attorney here in
12  California.  So keep your mouth shut.  Form.  Foundation.
13  Privilege.  Okay?
14    MR. ANDERSON:  You ready?
15    MR. FOSTER:  We'll get along fine.
16    MR. ANDERSON:  Ask the question.
17    MR. FOSTER:  Okay.
18  BY MR. FOSTER:
19    Q.  So you believe he was an employee; correct?
20    **A.  Yes.**
21    Q.  But you don't know whether he had a written
22  employment agreement; correct?
23    **A.  Correct.  My manager would know that.**
24    Q.  Okay.  And you have never talked about that with
25  your manager?

Page 28

1    **A.  We might have, but I can't say -- I don't recall.**
2    Q.  Do you know whether Mr. Hoefer had a written
3  independent contractor agreement?
4    **A.  I'm not sure.**
5    Q.  Okay.  Who would know?
6    **A.  My manager.**
7    Q.  Who handles all of the HR for your company?
8    **A.  I'm not sure.  I would say my manager.**
9    Q.  You don't have -- do you have an HR director?
10    **A.  Not that I'm aware of.**
11    Q.  Who do people talk to when they're hired?
12    **A.  My manager.**
13    Q.  So Moe Shalizi does all the internal paperwork and
14  shuffles papers and gets W-2s signed and does all that kind
15  of stuff?
16    MR. ANDERSON:  Lacks foundation.  Calls for
17  speculation.
18    **THE WITNESS:  I'm not sure.**
19  BY MR. FOSTER:
20    Q.  Does he have a person that does that kind of stuff
21  for him?
22    **A.  I'm not sure.**
23    Q.  Do your companies have any employees?
24    **A.  Yes.**
25    Q.  Okay.  Who would you think is an employee?

Page 29

1    **A.  My tour manager, Brandon Germain.**
2    Q.  And any other employees you can think of?
3    **A.  Clark Coss, my production manager.**
4    Q.  Okay.  Do you know if either of them have written
5  employment agreements?
6    **A.  I'm not sure what kind of contracts or paperwork**
7  **they have.**
8    Q.  Any other employees?
9    **A.  My lightings [sic] director -- my lighting**
10  **director Scott.  My laser -- my laser guy Vinny, they are**
11  **all employees.**
12    Q.  Okay.  Other than the four you've mentioned, any
13  others you can think of?
14    **A.  I've had others before, but just off the top of my**
15  **head right now, those four.**
16    Q.  Currently those four?
17    **A.  Currently.**
18    Q.  Okay.  Do you know -- and as to all four of those,
19  you don't know whether any of them have a written
20  employment agreement?
21    **A.  No.**
22    Q.  No, you don't know?
23    **A.  No.  I don't know if -- what kind of paperwork**
24  **they have.**
25    Q.  Okay.  Do any of your employees get any benefits,

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 30

1    like health insurance?
2        A.  I'm not too sure.  I'm not sure.
3        Q.  Do any of your employees get, you know, any
4    contributions to like a 401K or anything like that?
5        A.  I'm not sure.
6        Q.  Okay.  Again, who would know?
7        A.  My manager Moe.
8        Q.  Who is your -- do your companies have an outside
9    CPA firm that you use?
10       A.  Yes.  I have a business manager.
11       Q.  Who is that?
12       A.  Steven Macauley.
13       Q.  And -- and you said you have a business manager.
14           So he's not an employee; he's somebody outside you
15   use to do what?
16       A.  To my understanding, he does all of my finances
17   for every facet of my business.
18       Q.  But he's with his own company or with a company?
19       A.  He's with a company.
20       Q.  Okay.  So he would be the guy who would handle
21   taxes, whatever financial reporting, any of that kind of
22   stuff?
23       A.  Yes.
24       Q.  How long have you worked with him?
25       A.  Around six years.  Five to six years.

Page 31

1        Q.  Okay.  And is his company Wass- -- what's the name
2    of his company?
3        A.  His company is David -- DWA.  David Weise &
4    Associates.
5        Q.  DWA.  Okay.
6            Now, when Mr. Hoefer worked with
7    you -- well, when Mr. Hoefer worked with you, did he work
8    set hours, like 8:00 to 5:00, 9:00 to 5:00?
9        A.  No.
10       Q.  He -- he worked remotely the entire time he worked
11   for you or for your companies; right?
12       A.  Remotely?  I don't understand the question.
13       Q.  Remotely.  He worked from Arizona the entire time
14   that he worked for one of your companies unless he was
15   touring with you?
16       A.  Yes.
17       Q.  And he didn't work set hours; right?
18       A.  No.
19       Q.  He was just tasked with getting his stuff done and
20   appearing and doing a good job at performances; right?
21       A.  I would say so, yes.
22       Q.  And other than when you would see Mr. Hoefer at
23   performances over the years, you really didn't see him in
24   person; correct?
25       A.  Correct.

Page 32

1        Q.  Do you know whether any of your employees or
2    independent contractors have any confidentiality agreements
3    they've signed?
4        A.  I'm not sure on the paperwork that they have.
5        Q.  Or any work for hire agreements?
6        A.  Again, I'm not sure of any paperwork they have.
7        Q.  Are you aware of any agreement between Mr. Hoefer
8    where he assigned any copyright or intellectual property
9    rights to the plaintiffs in this case?
10       A.  I'm unaware of any paperwork.
11       Q.  Do you know how much Mr. Hoefer was being paid?
12       A.  I -- when?
13       Q.  Okay.  Well, let me -- let me just see if I can
14   get a general agreement.
15           Mr. Hoefer, when he originally began working for
16   you, was being paid on a per performance basis; correct?
17       A.  I don't recall.
18       Q.  Okay.  Do you recall a period of time when he was
19   paid on a per performance basis?
20       A.  No.
21       Q.  Okay.  At some point after he had been working
22   with you for a while, he began to be paid a retainer or a
23   monthly amount; correct?
24       A.  A retainer, yes.  Salary, yes.
25       Q.  Okay.  So when he first began receiving this

Page 33

1    retainer, that was at his request; correct?
2            MR. ANDERSON:  Mis- -- first of all -- first of
3    all, it's argumentative.  Misstates the testimony.
4            MR. FOSTER:  Hold on.  Hold on.  No speaking
5    objections.  Form, foundation or instruct him not to
6    answer.  No coaching.
7            MR. ANDERSON:  Counsel, in this district I have to
8    state the grounds.  I cannot just object as to form.
9            MR. FOSTER:  Okay.
10           MR. ANDERSON:  If you want to move this along --
11           MR. FOSTER:  I do.  But I don't want to hear
12   you --
13           MR. ANDERSON:  Stop.  Stop.  Stop.
14           MR. FOSTER:  -- coach your witness.
15           MR. ANDERSON:  Stop.  As you said, the court
16   reporter cannot take us both down when we're talking at the
17   same time.  If you don't want me to state the grounds for
18   the objection, which is required in this district, to move
19   this along I offer -- if you stipulate that if I just
20   object as to form that's sufficient, I'll abide by that.
21   But until you do that, I have to state the grounds so that
22   you can try to fix your question.
23           MR. FOSTER:  Okay.  I would assume -- just assume
24   you didn't.  So I don't want to hear you say misstates
25   prior testimony or any non --

**Page 34**

1      MR. ANDERSON:  So do you take that stipulation
2  that I've offered?
3      MR. FOSTER:  No.  I guess I'll just see how you
4  do.  Because you haven't done well so far.
5      (Unreportable simultaneous talking.)
6      MR. ANDERSON:  So can you read back the last
7  answer.  The last question, please.
8      (Record read by court reporter.)
9      MR. FOSTER:  Okay.  What's your objection?
10     MR. ANDERSON:  He's saying salary --
11     MR. FOSTER:  No.  No.  No.
12     MR. ANDERSON:  -- you're saying retainer.  I'm
13  sorry, I thought you asked me to explain my objection.
14     MR. FOSTER:  No.  I don't want to hear that from
15  you.  No coaching.
16     (Unreportable simultaneous talking.)
17     MR. FOSTER:  I didn't coach during your deposition
18  yesterday, and I don't expect you to do the same.  You've
19  been doing this too long.
20     MR. ANDERSON:  It's not coaching.  You asked me a
21  question --
22     MR. FOSTER:  It is.
23     MR. ANDERSON:  -- and I answered it.
24     MR. FOSTER:  All right.  So back to the -- back to
25  my questions.

**Page 35**

1  BY MR. FOSTER:
2      Q.  When you began paying Mr. Hoefer a monthly amount,
3  do you recall if that happened at some point?
4      A.  When he went on salary?
5      Q.  No.  I asked whether you recalled when Mr. Hoefer
6  began being paid a set amount every month.
7      A.  No.
8      Q.  Okay.  He was originally, in 2017, being paid
9  $6,000 gross a month.
10     Are you aware of that?
11     A.  I don't recall the specifics, but that sounds
12  right.
13     Q.  Okay.  And then sometime in 2018 that amount was
14  increased to $8,000 a month.
15     Do you recall that?
16     A.  I don't recall.
17     Q.  Do you recall there being an increase from 6,000
18  to 8,000 at some point?
19     A.  I don't recall specific numbers.
20     Q.  Okay.  Would it surprise you if I told you that
21  Mr. Hoefer began being paid $8,000 a month beginning in
22  2018, and then for the next five years didn't receive an
23  increase in pay?  Would that be surprising to you or would
24  you not be surprised by that?
25     A.  I don't handle any of that.

**Page 36**

1      Q.  No.  That wasn't my question.
2      I'm saying if Mr. Hoefer worked for five years and
3  didn't get an increase in pay, would that surprise you?
4      A.  No.
5      Q.  So from 2018 to 2023, no pay increase, you would
6  be okay with that; right?
7      A.  Yes.
8      Q.  Okay.  You were making more money those years,
9  weren't ya?
10     A.  No.  No.
11     Q.  No?
12     A.  I don't know.  I don't recall.
13     Q.  Well, hasn't -- has your career increased in the
14  last five to seven years?
15     A.  Yes.
16     Q.  As in you're making more money between those
17  years; correct?
18     A.  Yes.
19     Q.  Now, Mr. Hoefer, as you said earlier, worked for
20  your companies for about seven years; right?
21     A.  Yes.
22     Q.  Okay.  And during that seven years he essentially
23  did the same job.  He was a VJ.  He worked for animators,
24  and then at shows he performed, I guess, Tommy's magic or
25  whatever I've heard it referred to.

**Page 37**

1      Is that basically what he did?
2      A.  Can you repeat the question?
3      Q.  Sure.  So Mr. Hoefer worked with you for about
4  seven or eight years; right?
5      A.  Yes.
6      Q.  During that seven or eight years he basically did
7  the same thing, VJ'd your shows.  He worked with outside
8  animators or some of his own animators, and he showed up at
9  your live performances and VJ'd or used Tommy's magic;
10  right?
11     A.  Yes.
12     Q.  Okay.  What is it that caused you and Mr. Hoefer
13  to have a falling out?
14     A.  His -- he was just kind of acting not
15  professional, and it was affecting the rest of my team.  So
16  I had to let him go.
17     Q.  Yeah.  But I mean, you know, you guys had been
18  good friends for, like, seven years.  That -- you know,
19  stuff happens, you know, in business.  You know, you let
20  somebody go or whatever but that doesn't mean you're not
21  good friends with them anymore.  So what happened?  Why --
22  why aren't you still friends with him?
23     A.  Because I don't see it fit.  I don't see fit to do
24  that.
25     Q.  So your testimony is that sometime in 2023 he

**CHRISTOPHER COMSTOCK, VOLUME I**

**May 16, 2024**

Page 38

1  started to act weird or unprofessional?
2      A.  Unprofessional.
3      Q.  What's the word?
4      A.  Unprofessional.
5      Q.  Okay.  Give me -- give me some examples.
6          What was he doing?
7      A.  I don't have any specific examples.  I was told
8  that his -- I saw it for myself that he was acting very
9  erratic, and I had heard for a while from my team that
10  there was some issues with him, and I saw fit that he
11  wasn't a good fit for the team anymore.
12      Q.  Whose idea -- who presented you with the idea of
13  letting him go?  Was it Brandon?
14      A.  This time it was a mixture of me and Brandon.
15      Q.  Okay.  Yeah.  No, you guys are the ones who told
16  him, but Brandon came to you initially and said "We need to
17  get rid of this guy.  Here's what's going on," and you
18  agreed with that; right?
19      A.  Yes.
20          (Unreportable simultaneous talking.)
21          MR. ANDERSON:  Object -- well, go ahead.
22          THE WITNESS:  Yes.
23  BY MR. FOSTER:
24      Q.  And as you sit here, you can't think of what he
25  was doing that was unprofessional?

Page 39

1      A.  Just missing flights, messing up during shows,
2  acting erratically to no explanation.  I don't know what it
3  was, but it was -- it was appropriate to let him go.
4      Q.  Are you referring to one flight he missed in
5  Canada because of an issue?
6      A.  Many, many, many flights.
7      Q.  Your testimony is that he missed many flights and
8  missed many performances?
9      A.  No.
10      Q.  Your testimony is that he missed flights but did
11  not miss performances?
12      A.  He never missed performances.  Maybe in the
13  beginning when he went to prison but that's it.
14      Q.  Okay.  But in the last six or seven -- in the last
15  five years, he didn't miss performances; right?
16      A.  No.
17      Q.  And just so the record's clear, he never went to
18  prison.  You meant he went to jail?
19      A.  Yeah.
20      Q.  Okay.  So if somebody misses a flight but they
21  make the performance, why does that bug you?
22      A.  It's very unprofessional.  It's part of his job.
23      Q.  Okay.  How did that affect you?  I mean, you seem
24  like you got a million things going on in your head.  Why
25  would that even be a nano thought in your mind, Chris?

Page 40

1      A.  Because it affects everything.  It affects
2  transportation.  It affects -- my tour manager now -- not,
3  you know, paying attention to the day of show has to
4  reroute or has to handle Tommy's, you know, mistake of
5  missing flights.
6      Q.  Okay.  And -- and just so we're clear, this is
7  just your understanding.
8          How many -- how many flights do you think he
9  missed?
10      A.  I don't recall the number.
11      Q.  In seven years, how many do you think he missed,
12  or how many can you remember right now?
13      A.  A few.
14      Q.  Okay.
15      A.  But I don't remember the specifics.
16      Q.  Okay.  Well, I'm just asking.  I'm not -- it's not
17  a memory test.
18      A.  Yeah.
19      Q.  It's my only chance to talk to you before we go to
20  trial, and so I'm just trying to get the best memory you
21  have.
22          So a few, is that your best memory on flights
23  missed?
24      A.  Yes.
25      Q.  Your tour manager Brandon didn't like Thomas;

Page 41

1  correct?
2      A.  I'm not sure of his personal feelings.
3      Q.  He didn't -- he never told you that he didn't
4  like -- let me strike that.
5          Isn't it true that you were aware that Brandon and
6  Thomas didn't get along well?
7      A.  No.  That's not true.
8      Q.  Okay.
9      A.  I was not aware.
10      Q.  So going back -- I need to get my head around
11  this.
12          So was it your idea to file a lawsuit against a
13  seven-year friend to try to recover a bunch of beat-up used
14  equipment and computers?  Was that your idea?
15          MR. ANDERSON:  Objection.  Calls for attorney
16  client communications as to who he discussed with regarding
17  the lawsuit, the filing of the lawsuit.  I'll instruct him
18  not to answer.
19  BY MR. FOSTER:
20      Q.  Was it your idea -- when did you decide that you
21  wanted to file a lawsuit against Mr. Hoefer to recover a
22  bunch of old computers and equipment that he had used?
23          MR. ANDERSON:  Objection.  Argumentative.
24          MR. FOSTER:  When did you decide, I asked.
25          MR. ANDERSON:  Objection.  Argumentative.

**Page 42**

1    MR. FOSTER:  It's not argumentative.
2    MR. ANDERSON:  I'm not going to debate objections
3  with you.  Let's just get this done.
4    MR. FOSTER:  Okay.  Well, keep -- keep doing it.
5  We're going to build up -- we're going to build a body of
6  work here.
7  BY MR. FOSTER:
8    Q.  When did you decide that did you wanted to file a
9  lawsuit against your seven-year friend, Mr. Hoefer, to
10  recover some old computers and other equipment?
11    MR. ANDERSON:  Objection.  Argumentative.
12    THE WITNESS:  It was decided when he wouldn't give
13  them back.
14  BY MR. FOSTER:
15    Q.  Do you know that Mr. Hoefer was told by
16  Mr. Shalizi that that equipment was his?  So the lawsuit
17  would be seeking to get back equipment that had been given
18  to Mr. Hoefer.
19    A.  I'm not aware of the conversation that they had.
20    Q.  Okay.  What do you think the value of the few
21  pieces of used computers are that you filed your lawsuit
22  for?
23    A.  I couldn't say.
24    Q.  Okay.  Less than $20,000 used, a few used
25  computers?

**Page 43**

1    A.  I --
2    Q.  Sound about right?
3    A.  Might be.  I'm not sure on specific prices.
4    Q.  Okay.  But it was basically the computers that had
5  been purchased during the last six or seven years.  He
6  would get a new computer every couple years.  That stuff
7  doesn't retain its value very well, does it?
8    A.  I wouldn't say so.
9    Q.  Now, when you -- strike that.
10    Did you and Mr. Brand- -- what was Brandon's last
11  name, the tour manager?
12    A.  Germain.
13    Q.  So you and Mr. Brandon Germain called Mr. Hoefer
14  or met with him when you let him go?
15    A.  Called.
16    Q.  So Thomas picks up the phone, you two are on the
17  phone, and you guys let him know that you're parting ways;
18  right?
19    A.  Yes.
20    Q.  And did Mr. Hoefer ask you why?
21    A.  No.
22    Q.  Do you recall telling him -- or somebody on the
23  phone telling him that he'd been acting weird and him
24  wanting details and nobody really giving him any?
25    A.  I don't recall that specific sentence.

**Page 44**

1    Q.  If Mr. Hoefer remembered it that way, would that
2  surprise you?
3    A.  I can't recall.
4    Q.  Okay.  Well, you didn't give me a lot of details
5  today; so I'm imagining it wouldn't be unlikely that you
6  wouldn't have given him a lot of details either.
7    Is that fair?
8    A.  It's hard to say.
9    Q.  Now, after Mr. Hoefer was let go, he didn't -- he
10  didn't start blowing up your phone and texting you and
11  calling you, and -- you know, he walked away; right?
12    A.  Can you rephrase the question?
13    Q.  Sure.  I was trying to use some younger people's
14  language.
15    But when Mr. Hoefer was fired for missing some
16  flights and, you know, acting weird, after that happened,
17  he didn't start calling you and texting you and asking for
18  his job back?  He didn't do that, did he?
19    A.  Yes, he did.
20    Q.  Okay.  Do you have those text messages?
21    A.  Yeah.
22    Q.  What -- what do they say?  I haven't seen them.
23  What did he say?
24    A.  I don't recall the specifics.
25    Q.  Okay.

**Page 45**

1    MR. FOSTER:  Counsel, can you produce those if you
2  haven't?
3    MR. ANDERSON:  I don't have them, but I'll look
4  into it.
5    MR. FOSTER:  Okay.  Well, can you get them from
6  your client?  That's what I'm asking.
7    MR. ANDERSON:  No.  I understand.
8  BY MR. FOSTER:
9    Q.  So at some point after Mr. Hoefer was fired, he
10  was presented with a couple of written agreements from your
11  lawyers; correct?
12    A.  I'm not sure.
13    Q.  Okay.  I'm going to show you what I'll mark as
14  Exhibits 1 and 2 to your deposition.  The first document is
15  a confidentiality and non-disclosure agreement, that will
16  be number one, and number two is a release agreement.
17    MR. ANDERSON:  May I make an observation?
18    MR. FOSTER:  Sure.
19    MR. ANDERSON:  Technically, they should be
20  numbered consecutively to the last exhibit yesterday.  I'm
21  not going to object on that grounds, but it makes life
22  easier.  If you happen to know, you can do that.  If you
23  don't, that's absolutely fine.
24    MR. FOSTER:  Yeah.  No.  I agree with that if we
25  can.  I'll see if I can figure that out.  Well --

**CHRISTOPHER COMSTOCK, VOLUME I**

**May 16, 2024**

Page 46

1        MR. ANDERSON:  Let's just go with one, two.
2        MR. FOSTER:  Yeah.  Because the depositions and
3   given exhibits were A, A, B, B, Z, V, 1.  I mean, your
4   associate was all over the place with that stuff.  So
5   let's -- you agree with one and two and all that?
6        MR. ANDERSON:  I'm not going to object.
7        MR. FOSTER:  All right.  Let's do that.  So
8   Exhibit 1 is going to be the confidentiality agreement, and
9   Exhibit 2 is going to be the release document.
10       (Defendants' Exhibit 1 marked for identification.)
11       (Defendants' Exhibit 2 marked for identification.)
12       MR. ANDERSON:  Do you have copies?
13       MR. FOSTER:  I do.  I don't have everything but
14  I do have that.  Are you going to mark those?
15       THE COURT REPORTER:  There -- I have them.
16       MR. FOSTER:  Oh.
17       THE COURT REPORTER:  Yeah.  You just hand them
18  over, Counsel, I got them.  It'll be taken care of.
19  They're marked for the record.  Can we go off the record
20  for just a moment?
21       MR. FOSTER:  Yeah.  Yeah, please.
22       THE VIDEOGRAPHER:  The time is 11:35 a.m.  We're
23  going off the record.
24       (Break taken from 11:35 a.m. to 11:42 a.m.)
25       THE VIDEOGRAPHER:  The time is 11:42 a.m.  We're

Page 47

1   back on the record.
2   BY MR. FOSTER:
3        Q.  Mr. Comstock, I'm showing you now defendants'
4   Exhibits 1 and 2.  Exhibit 1 is a confidentiality and
5   non-disclosure agreement, and Exhibit 2 --
6        THE VIDEOGRAPHER:  I'm sorry.  Your mic, Counsel.
7        MR. FOSTER:  I talk pretty loud, though.  Do I
8   need to start over?  Yes?
9        THE VIDEOGRAPHER:  Yes, please.
10  BY MR. FOSTER:
11       Q.  Okay.  Mr. Comstock, before the break I had marked
12  Exhibits 1 and 2 for you to take a look at.  One of them is
13  Exhibit 1, which is a confidentiality and non-disclosure
14  agreement I'm handing you, and Exhibit 2 is a release
15  agreement that I'm going to hand you.  I'd like you to
16  focus first on Exhibit 1, which is a confidentiality and
17  disclosure agreement.
18       Do you have that you in front of you?
19       **A.  Yes.**
20       Q.  Now, were you aware that when Mr. Hoefer was fired
21  that he was presented with these two documents, Exhibits 1
22  and 2, as part of a $50,000 severance offer?
23       **A.  I wasn't -- I wasn't sure exactly what they were**
24  **at the time.**
25       Q.  Were you -- are you aware now that he was

Page 48

1   presented with Exhibits 1 and 2 as part of a $50,000
2   severance offer?
3        **A.  Now I'm aware.**
4        Q.  Okay.  Were you aware of this at the time, back in
5   July or August of 2023, when these documents were
6   presented?
7        **A.  Yeah.  I don't handle all that -- any paperwork**
8   **like that.**
9        Q.  Okay.  Were you involved in the decision to pay
10  him $50,000 as part of his severance offer?
11       **A.  Yes.**
12       Q.  Okay.  You just weren't as involved in the
13  documents.
14       You were involved in the decision to pay him the
15  50 grand, though; right?
16       **A.  Involved?  Not in the documents --**
17       Q.  You approved it.
18       **A.  -- involved in the -- in the severance.  Yes,**
19  **involved in the severance.**
20       Q.  Okay.  Just so we have a clear record, you were
21  involved in the decision to offer him $50,000 after he was
22  fired; correct?
23       **A.  Yes.**
24       Q.  You just weren't as involved in the details of
25  Exhibits 1 and Exhibits 2; correct?

Page 49

1        **A.  Correct.**
2        Q.  I'd like you to take at look at -- well, strike
3   that.
4        But were you aware that he was presented with
5   documents to sign as part of getting his $50,000?
6        **A.  Not right when he was fired.  I don't really**
7   **understand the question, to be honest.**
8        Q.  Yeah.  So did you understand that when Mr. Hoefer
9   was offered the $50,000 that he would need to sign some
10  type of release or settlement?
11       **A.  Yes.**
12       Q.  Okay.  So I'd like you to take a look at
13  Exhibit 1, which is one of the documents that Mr. Hoefer
14  was required to sign in order to receive the generous
15  $50,000 severance.  On page 1, paragraph 1, labeled
16  "Confidential information," do you see that paragraph?
17       **A.  Yes.**
18       Q.  So this required Mr. Hoefer to agree that he would
19  not discuss with anybody or divulge to anybody anything he
20  learned during his seven years with the company.
21       Do you see that?
22       **A.  I --**
23       MR. ANDERSON:  Take your time to read it --
24       THE WITNESS:  Can you ask again?
25       MR. FOSTER:  Yeah.  We're just looking at the

Page 50

1  first couple of sentences --
2      THE WITNESS:  Okay.
3      MR. FOSTER:  -- Mr. Comstock.
4  BY MR. FOSTER:
5      Q.  It reads -- you know, "For purposes of this
6  agreement 'confidential information' shall" -- include any
7  materials, et cetera, et cetera -- which Mr. Hoefer may
8  have obtained during his employment.
9      A.  Sorry.  You skipped around.  Yes.
10     Q.  So basically he was being required to keep
11 confidential anything that he reviewed or received during
12 his seven years with your companies generally; right?
13     A.  I don't know exactly what all these words mean,
14 but I can't say.  Sure.
15     Q.  Okay.  Well, anyway.  So he was required to sign a
16 confidentiality, meaning he wouldn't talk to anybody about
17 anything that happened during his seven years there.  Take
18 a look at the next page, under paragraph 4, you see where
19 it says "Work made for hire"?
20     A.  Yes.
21     Q.  Now, you're a musician.
22         You know what that means, don't yeah?
23     A.  Can you remind me?
24     Q.  Well, work for hire means that you're assigning
25 over all of your intellectual property rights that you may

Page 51

1  have.
2      MR. ANDERSON:  Objection.  That's actually -- I'm
3  sorry.  I'm trying to think about -- narrowly to say this.
4  Calls for a legal conclusion and is argumentative.
5      MR. FOSTER:  Okay.
6  BY MR. FOSTER:
7      Q.  Do you -- have you heard the term "work made for
8  hire" before?
9      A.  That specific term, no.
10     Q.  Okay.  Do you understand that -- well, why don't
11 you read that and see what it says?  Read the first two
12 sentences and you'll understand what it means.
13     A.  It's a little confusing.  Can you explain?
14     Q.  Yeah.  So basically what paragraph 1 required was
15 him to keep confidential anything he learned, documents, or
16 otherwise, while he was working for your companies for
17 those seven years, and paragraph four requires him to
18 assign over to you or your companies any copyrights or
19 intellectual property that he created during those seven
20 years.
21         Were you aware that he was being asked to sign
22 something that required him to do those two things?
23     MR. ANDERSON:  Objection.  Mischaracterizes the
24 documents.
25 //

Page 52

1  BY MR. FOSTER:
2      Q.  Were you aware that he was being asked to sign
3  something that did those two things?
4      THE WITNESS:  I --
5      MR. ANDERSON:  Objection.  Mischaracterizes the
6  document.
7      MR. FOSTER:  This is a yes or no, and you've made
8  your record.
9  BY MR. FOSTER:
10     Q.  Were you aware that he was being asked to sign a
11 document that contained those two provisions?
12     A.  Not specifically, no.  I don't know -- I don't
13 know the paperwork.  I don't know the documents.
14     Q.  Well, you got it in front of you.
15     A.  Yes.  But when it happened, though -- I don't have
16 paperwork like this.
17     Q.  Okay.  Let's take a look at Exhibit 2, which is
18 the second document that Mr. Hoefer was being required to
19 sign in order get this $50,000 severance payout for his
20 seven years of service.  It's call a release agreement.
21         Do you see that?
22     A.  Yeah.
23     Q.  Do you generally know what a release even means?
24     A.  No.
25     Q.  Okay.  Generally a release is where you're

Page 53

1  releasing any claims you may have.  Like in this case,
2  Mr. Hoefer was being asked to release any claims he had
3  against you, Marshmello Creative, 365 Touring, you know,
4  Moe, Brandon?
5      A.  Mm-hmm.
6      Q.  So he was being asked to release any claims he
7  might have.
8         Have you heard of that type of a document before?
9      A.  No.
10     Q.  Okay.  Well, usually -- you're not a lawyer, but
11 if you were going to pay somebody money you would want to
12 make sure that they weren't going to turn around and sue
13 you for that same money; right?
14     A.  Can you rephrase it?
15     Q.  Yeah.  If you were going to pay somebody money to
16 settle or make a lawsuit go away, you would want them to
17 sign a release saying you're not going to turn around and
18 sue me again tomorrow; right?
19     A.  I'm not sure how it all works.
20     Q.  Okay.  Well, anyway, the point is, this release
21 document required Mr. Hoefer to agree that he would never
22 bother you again, bother 365 Touring, Marshmello Creative.
23 He would take his $50,000 and go away.
24         Can you -- can you follow me on that part?
25     A.  I don't know what any of this does.

CHRISTOPHER COMSTOCK, VOLUME I

**May 16, 2024**

1   Q. Do you -- do you understand what I'm saying?
2   A. I understand what you're saying, but I don't know
3   if that's what this says.
4   Q. Okay. Well, one of the things Mr. Hoefer was
5   required to do on page 2 of this document -- small "e" --
6   do you see small "e" there?
7   A. Yes.
8   Q. Now, he was required to initial that he had
9   consulted with an attorney before signing this.
10      Do you see that?
11  A. I see that.
12  Q. And then if you flip to page 3, paragraph 11, do
13  you see that?
14  A. I see paragraph 11.
15  Q. Okay. And do you see where it says that each
16  party to this agreement represents that they carefully read
17  it; it's been explained by an independent attorney.
18      Do you see that?
19  A. Yes.
20  Q. So Mr. Hoefer was being required to initial and
21  say that he had spoken to an attorney; right?
22  A. Right.
23  Q. And he was, in paragraph 11, acknowledging that he
24  had spoken to his independent attorney about this.
25      Do you see that?

1   A. In paragraph 11?
2   Q. Yeah.
3   A. Yes.
4   Q. So Mr. Hoefer received these -- this paperwork,
5   and would it surprise you, Mr. Comstock, to know that, you
6   know, Mr. Hoefer is equally well versed in legal matters
7   about to the same level as you?
8   A. I don't know his --
9   Q. Okay.
10  A. -- legal background.
11  Q. Okay. Well, take my word. You know, when
12  Mr. Hoefer received these documents that you're trying to
13  understand and the legal documents told him that he needed
14  to go see a lawyer and initial, right, initial his name
15  saying he had seen a lawyer.
16      We saw that; right?
17  A. Mm-hmm.
18  Q. Yes?
19  A. Yes.
20      MR. ANDERSON: Objection. Mischaracterizes the
21  document.
22  BY MR. FOSTER:
23  Q. When Mr. Hoefer went and saw a lawyer, the lawyer
24  responded back to your people and said this is not fair.
25  This is -- you know, Mr. Hoefer owns intellectual property

1   rights. This is not a fair amount, 50,000, et cetera.
2       Did you hear that the attorney responded when you
3   guys made your $50,000 offer?
4   A. I don't recall.
5   Q. You know at some point Mr. Hoefer's attorney got
6   involved; right?
7   A. Correct.
8   Q. And that attorney is me; right?
9   A. Correct.
10  Q. Okay. So I send a letter to your people saying
11  this is a tremendous slap in the face, low ball. My client
12  owns all kinds of copyrights, and you guys didn't have any
13  signed agreements with my client at all and made a offer to
14  settle the case, and I think my offer was a million
15  dollars.
16      Do you remember that?
17  A. I remember that number.
18  Q. Okay. And was that offer presented to you?
19  A. What do you mean presented?
20  Q. Well, you said you knew about it. So, you know,
21  do you think you've seen my letter where I told you guys
22  you owed a lot more and we own the intellectual property,
23  and I offered to settle the case for a million dollars?
24  A. I was told that --
25  Q. Okay.

1   A. -- that you wanted million a dollars.
2   Q. You may not have seen it but you heard that;
3   right?
4   A. Yes.
5   Q. And so were you aware that over the next couple of
6   months, at least, there was communication between your
7   attorney and me about a settlement, who owned intellectual
8   property.
9       Did you know that was going on?
10  A. I'm not sure about the conversations you guys had.
11  Q. Okay. Who -- who is your point of contact at your
12  law firm?
13  A. Josh Binder.
14  Q. Okay. What about -- what about your litigation
15  firm; is it Mr. Anderson?
16  A. Right now?
17  Q. Yeah.
18  A. Yeah, Josh. Josh, mostly everything.
19  Q. Okay.
20  A. I go through Josh.
21  Q. So when did you first meet Mr. Anderson?
22  A. I don't recall.
23  Q. Okay. Well, you filed a lawsuit.
24      Did you meet him before you filed the lawsuit?
25  A. Josh handles that.

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 58

1    Q.  Okay.  So your attorney, Josh Binder, worked with
2  Mr. Anderson's firm in putting together the lawsuit?
3         MR. ANDERSON:  Objection.  Vague.  Ambiguous.
4  Uncertain, and I object to the extent it calls for
5  attorney/client communications.  How would he learn other
6  than through his communications with his lawyer?
7  BY MR. FOSTER:
8    Q.  Well, I asked -- I asked when you first met
9  Mr. Anderson and you couldn't recall.
10        Was the first time you met him in person
11  yesterday?
12    A.  I -- I'm not sure.
13    Q.  Can you think of any time you met Mr. Anderson
14  before yesterday?
15    A.  I don't recall.
16    Q.  Can you think of any time you met him before
17  yesterday?  That's a yes-or-no question.
18    A.  No.
19    Q.  Did you -- have you spoken to Mr. Anderson before
20  you met with him yesterday?
21    A.  Face to face?
22    Q.  Spoken.  Over the phone.
23    A.  No.
24    Q.  No.  So your involvement, your personal
25  involvement in the filing of the complaint was zero;

Page 59

1  correct?
2         MR. ANDERSON:  Objection.
3         (Unreportable simultaneous talking.)
4         MR. FOSTER:  Your personal involvement.
5         THE WITNESS:  I don't understand the question.
6  BY MR. FOSTER:
7    Q.  Sure.  You understand Mr. Anderson's firm filed a
8  lawsuit; right?
9    A.  Yes.
10    Q.  Okay.  And you just testified that you met him in
11  person for the first time yesterday and you hadn't spoken
12  to him over the phone previously that you could recall?
13        MR. ANDERSON:  Mischaracterizes the testimony.
14  BY MR. FOSTER:
15    Q.  Correct?
16    A.  Is that what I just said?
17    Q.  Yeah.
18    A.  Yes.
19    Q.  Just say correct if it is.
20    A.  Correct.
21    Q.  Okay.  So in terms of preparing the lawsuit, you
22  didn't work with Mr. Peter Anderson or his firm directly;
23  correct?
24    A.  Correct.
25    Q.  Okay.  But you think that maybe your other lawyer

Page 60

1  who's here today, Josh Binder, may have worked on your
2  behalf on getting this lawsuit filed?
3    A.  Correct.
4    Q.  Okay.  When did you first see the complaint or
5  lawsuit?
6    A.  I don't recall.
7    Q.  Okay.  It was after it was filed, though; right?
8         MR. ANDERSON:  Calls for speculation.
9         THE WITNESS:  I don't recall.
10  BY MR. FOSTER:
11    Q.  Have you ever seen it?
12    A.  I don't recall.  I might have.
13    Q.  Well, it's a pretty, pretty lengthy document.
14  Seems like the kind of thing you would remember.
15        As you sit here today, can you remember whether
16  you ever saw this document before?
17    A.  I don't recall.
18    Q.  Can you think of -- do you think it's most likely
19  that you have not seen this before today?
20         MR. ANDERSON:  Objection.  Calls for speculation.
21         THE WITNESS:  I'm not sure.
22  BY MR. FOSTER:
23    Q.  How would you find out?
24    A.  I don't understand that question.
25    Q.  Yeah.  How would you find out?  Who -- if you had

Page 61

1  seen this before today -- well, strike that.
2         You understand, having only been involved in one
3  other lawsuit in your whole life; right?  Is that correct?
4  You've only been in one?
5    A.  Correct.
6    Q.  You understand that a lawsuit is kind of a big
7  deal; right?
8         MR. ANDERSON:  Objection.  Vague and ambiguous.
9         MR. FOSTER:  Well, let me ask it.
10  BY MR. FOSTER:
11    Q.  Do you think a lawsuit is a big deal?
12    A.  It depends.
13    Q.  Okay.  Do you think this lawsuit is a big deal?
14  Because it's a big deal to my client.
15        Do you think it's a big deal?
16    A.  I take it seriously.
17    Q.  Okay.  And I take it you haven't filed a lot of
18  lawsuits against other people, other seven-year friends,
19  have you?
20    A.  I don't recall.
21    Q.  Well, you know you haven't; right?  You've never
22  filed another lawsuit against anybody else, have you?
23    A.  I don't recall.
24    Q.  As you sit here today, you don't know whether
25  you've ever filed a lawsuit suing somebody else?

**Page 62**

1    A. I don't think so. I don't recall specifics.
2    Q. Okay. Well, I thought you said earlier you'd only
3  been involved in one court case?
4    A. In a deposition. One deposition.
5    Q. Okay. Have there been other lawsuits you have
6  been involved in where you have not given a deposition?
7    A. I don't recall.
8    Q. Can you think of any?
9    A. I don't recall.
10    Q. Well, can you think of any is a yes-or-no --
11    A. No.
12    Q. -- answer. Okay.
13        So, again, do you think it's most likely that
14  you've never seen this complaint before?
15        MR. ANDERSON: Calls for speculation.
16        THE WITNESS: I don't recall. I can't say.
17  BY MR. FOSTER:
18    Q. Well, if you look at that it, will that help --
19  will that help you refresh your memory about whether you've
20  seen it before?
21        MR. ANDERSON: You've been waving it around but
22  haven't showed it to him.
23        MR. FOSTER: I just handed it to him.
24        MR. ANDERSON: And don't you need to mark it as an
25  exhibit?

**Page 63**

1        MR. FOSTER: Only if I want to.
2        MR. ANDERSON: Okay.
3        THE WITNESS: I don't recall.
4  BY MR. FOSTER:
5    Q. Okay. So -- well, pick it up at least and look at
6  the caption. Flip through a few pages.
7    A. No. I don't recall.
8    Q. Okay. Let me -- hand that back, please,
9  Mr. Comstock. Do you see -- I'm going hand you back the
10  complaint. The complaint is dated September 5, 2023.
11        Do you see on the first page of the complaint in
12  what we attorneys like to call the caption that you
13  individually are suing Mr. Hoefer?
14        That says Christopher Comstock, plaintiff; right?
15    A. Yes.
16    Q. So it's Marshmello Creative, a company that you
17  are the majority owner of, I assume; right?
18    A. Marshmello Creative.
19    Q. What's that?
20    A. Marshmello Creative, yes.
21    Q. Okay. Are you the majority or the only owner?
22    A. I'm not sure.
23    Q. Are you the majority owner?
24    A. I'm not sure.
25    Q. You don't think you know whether you own the

**Page 64**

1  controlling interest in your own company?
2    A. I'm not sure all of the paperwork and everything
3  for it.
4    Q. Have you -- has somebody told you that you're the
5  majority owner?
6    A. I don't recall.
7    Q. Okay. So Marshmello Creative, and then were you
8  aware that you personally were suing Thomas Hoefer?
9  Christopher Comstock, not just your companies.
10    A. Yes.
11    Q. Okay. So you knew that.
12        At what point did you learn that you were suing
13  your friend --
14        MR. ANDERSON: Objection. Argumentative.
15        THE WITNESS: -- after the lawsuit was filed or --
16        THE WITNESS: I don't recall.
17        MR. FOSTER: Okay.
18        MR. ANDERSON: Counsel, it's after 12:00. What is
19  your plan for the 30(b)(6) deposition? We haven't received
20  a Zoom link yet.
21        MR. FOSTER: Okay. I was told a Zoom link had
22  been sent, but the plan is up to you, I guess, or up to us
23  to discuss. Because I had e-mailed you last night
24  proposing that we have Mr. Shalizi in his 30(b)(6) and
25  individual capacity give his deposition at the conclusion

**Page 65**

1  of Mr. Comstock's, but I'd also told you that I would be
2  open to taking a break and resuming Mr. Comstock's if you
3  want to put Mr. Shalizi in at 1:30 or 2:00 o'clock. But
4  I'm -- I'm going to take my full time. I'm not going to
5  rush through depositions, much as your associate took seven
6  hours yesterday with Mr. Hoefer during his deposition.
7        MR. ANDERSON: Well, look, you noticed it for a
8  half day. You changed the 30(b)(6) deposition from 1:00 to
9  1:30, and so we're stopping so you can take the 30(b)(6).
10        MR. FOSTER: That's fine.
11        MR. ANDERSON: Now, my question to you is whether
12  you intend to go to 1:00 or to 1:30?
13        MR. FOSTER: Okay. I'll go to 1:30, and then
14  we'll just --
15        MR. ANDERSON: Well, no --
16        (Unreportable simultaneous talking.)
17        MR. FOSTER: -- suspend his without warning.
18        MR. ANDERSON: I misspoke. Whether you intend to
19  start the 30(b)(6) deposition at 1:00 or 1:30, and then we
20  can back in to when we stop here. Because I would like to
21  eat, but I will forfeit that if it's important and it
22  solves your concern. But if you can let me know when you
23  want to start the 30(b)(6) deposition, then I will let the
24  designated witness know. I don't have cell service
25  apparently. So maybe you sent a link, but I haven't

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 66

1  received it.
2      MR. FOSTER:  Yeah.  My assistant told me she sent
3  it before I even started, so...
4      MR. ANDERSON:  Yeah.  The last e-mail I got is
5  9:28.
6      MR. FOSTER:  Okay.
7      MR. ANDERSON:  So why don't we -- I'm trying to
8  figure out -- why don't we go --
9      MR. BINDER:  Try to add my wifi, maybe --
10     MR. ANDERSON:  Okay.  Let's go off the record for
11  a second because we don't need ---
12     MR. FOSTER:  That's fine.  We can go off.
13     THE VIDEOGRAPHER:  The time is 12:06 p.m.  We're
14  going off the record.
15     (Pause taken from 12:06 p.m. to 12:09 p.m.)
16     THE VIDEOGRAPHER:  The time is 12:09 p.m.  We're
17  back on the record.
18     MR. FOSTER:  Okay.  Before I resume questioning
19  I've noticed three depositions to go today and tomorrow.
20  I've currently got a deposition of Mr. Comstock.  Under the
21  rules I'm allowed up to seven hours to complete that depo.
22  I've been making good progress, but I'm nowhere near
23  completed.  So we've got scheduled a 1:30 deposition today
24  for a 30(b)(6) deponent or deponents.  Counsel has
25  indicated that there's only one person, surprisingly, who's

Page 67

1  going to testify on all 12 of the areas and will take up
2  sufficiency of that during the deposition.  But I've also
3  got an individual deposition that's been noticed for more
4  than three weeks for Moe Shalizi, I believe, scheduled for
5  tomorrow morning at 9:30 a.m.  That deposition has been
6  scheduled remotely to accommodate Mr. Shalizi's request
7  that he be allowed to appear remotely.  And the choice is,
8  do we complete Mr. Comstock's deposition because he,
9  contrary to what you told me, has a lot more discoverable
10  information than you -- well, you told me it was going to
11  be a short deposition, and --
12     (Unreportable simultaneous talking.)
13     MR. ANDERSON:  Read the questions you're asking.
14  This is a complete waste of time.  You've wasted two hours
15  so far.
16     MR. FOSTER:  Really?
17     MR. ANDERSON:  But anyway, Counsel, go ahead.
18  Make your statement.
19     MR. FOSTER:  I think I've crushed it so far.  So
20  that's why attorneys don't get along, but you told me he
21  would have very little relevant information.  It turns out
22  he does.  So his deposition is going to go forward until
23  I'm satisfied that I'm completed, and I haven't received a
24  proposal from you -- if you're telling me that Mr. Shalizi
25  cannot be available remotely tomorrow for his deposition

Page 68

1  that's been scheduled for over three weeks, then you need
2  to tell me that.
3      MR. ANDERSON:  Okay.  First of all, did you
4  subpoena Mr. Shalizi for his deposition?
5      MR. FOSTER:  No.  You told me --
6      MR. ANDERSON:  Okay.  Stop.
7      MR. FOSTER:  -- you told me a subpoena was not
8  necessary.
9      MR. ANDERSON:  That is a complete false -- and
10  sanctionable falsehood.
11     MR. FOSTER:  Stop blowing your horn.  That's not
12  false and it's not sanctionable.
13     MR. ANDERSON:  It is both.  Now, sir, this is what
14  we're going to do --
15     (Unreportable simultaneous talking.)
16     MR. FOSTER:  No.  No.  You tell me what your
17  proposal is.
18     (Unreportable simultaneous talking.)
19     MR. ANDERSON:  You -- you noticed a deposition to
20  start today at 9:30 followed by a separate deposition at
21  1:00.
22     MR. FOSTER:  10:30.  10:30.
23     MR. ANDERSON:  No.  You noticed it for 9:30.
24     MR. FOSTER:  Finish.
25     MR. ANDERSON:  You noticed it for 9:30, and you --

Page 69

1  yesterday at mid afternoon you changed it to 10:30.  I
2  pointed out that that gives you less time to complete
3  Mr. Comstock's deposition.  You noticed a half-day
4  deposition.  The rule does not allow you to take it over
5  multiple days for seven hours.
6      MR. FOSTER:  Yes, it does.
7      MR. ANDERSON:  No, it doesn't.  Read the rule.
8      MR. FOSTER:  Oh, no.  You are so wrong about that,
9  Peter, just as usual.
10     MR. ANDERSON:  Will you stop interrupting me,
11  please.
12     MR. FOSTER:  Well, finish.
13     MR. ANDERSON:  Okay.  So Mr. -- excuse me, the
14  Rule 30(b)(6) deposition, which you want to move from 1:00
15  to 1:30, that's fine, but I have to go back to my office to
16  participate in a Zoom deposition.  Okay?  Unless you have a
17  screen here.  If you have a screen here --
18     MR. FOSTER:  Do you have a computer with you?
19     MR. ANDERSON:  Okay.  We're not going to play that
20  game.
21     MR. FOSTER:  Do you have a computer with you?
22     MR. ANDERSON:  We're not going to play that game.
23     MR. FOSTER:  No.  No.  Answer me.
24     MR. ANDERSON:  Stop interrupting me.
25     MR. FOSTER:  Do you have a computer?

Page 70

1      MR. ANDERSON:  Stop interrupting me.
2      MR. FOSTER:  Well, answer my question.
3      MR. ANDERSON:  If you know anything about -- we
4  cannot use two computers on Zoom at the same time in the
5  same office because they will interfere with each other.
6  I've seen than happen.
7      MR. FOSTER:  Who --
8      MR. ANDERSON:  My office -- my office is 15
9  minutes away.  We will stop, and if you don't agree to
10 this, I will adjourn the deposition at 1:00 o'clock, this
11 deposition.  I will return to my office where I can use --
12     MR. FOSTER:  Okay.
13     MR. ANDERSON:  -- my computer there.  Stop.
14     MR. FOSTER:  Finish.
15     MR. ANDERSON:  Stop.
16     MR. FOSTER:  You're wasting our time.  Finish.
17     MR. ANDERSON:  So we will --
18     MR. FOSTER:  Finish.
19     MR. ANDERSON:  -- I strongly suggest to you that
20 you ask whatever you think are important questions
21 before -- between now and 1:00 o'clock.  At that point you
22 either agree --
23     MR. FOSTER:  Finish.
24     MR. ANDERSON:  -- that we're done or we adjourn.
25 Okay.

Page 71

1      MR. FOSTER:  The only thing --
2      MR. ANDERSON:  Wait.  Wait.  Wait.
3      MR. FOSTER:  Finish.
4      MR. ANDERSON:  And -- and we will start at 1:30
5  the Rule 30(b)(6) deposition.  You have never --
6      MR. FOSTER:  Finish.
7      MR. ANDERSON:  -- you have never subpoenaed
8  Mr. Shalizi for the deposition tomorrow.  I've told you
9  that --
10     MR. FOSTER:  Finish.
11     MR. ANDERSON:  -- in open court --
12     MR. FOSTER:  You're repeating yourself.
13     MR. ANDERSON:  -- and on the record.  I said that
14 he would -- could not be produced without a subpoena.  He
15 will be available today starting at 1:30 at your choice,
16 and you could ask him questions outside the topics.  That's
17 what I said in court.
18     MR. FOSTER:  Are you done?
19     MR. ANDERSON:  Yes.  Let's --
20     MR. FOSTER:  Okay, well --
21     (Unreportable simultaneous talking.)
22     MR. FOSTER:  I'm going to say one thing.  Two
23 things.  One, Shalizi's 30(b)(6) deposition is gonna go a
24 lot longer than three or four hours.
25     MR. ANDERSON:  Then you shouldn't have noticed it

Page 72

1  for a half day.
2      MR. FOSTER:  I didn't notice anything for a half
3  day.
4      MR. ANDERSON:  Yes, you did.
5      MR. FOSTER:  Depositions will continue until
6  completed up to seven hours.  That's how things are done.
7  Maybe not in your world.
8      MR. ANDERSON:  Okay.
9      MR. FOSTER:  But in true litigation world, that's
10 how things are done.  Attorneys work together, and they
11 finish depositions.  The judge is going to be nonplussed
12 with your attitude here and the position you're taking.
13 I'm in control of these depos.  I can either continue with
14 him and you could propose to make Mr. Shalizi available
15 tomorrow or Monday.  I'd be open to that, but I'm entitled
16 to complete this deposition.  I'm not limited to three and
17 a half hours or three hours or anything.  You're not in
18 charge.
19     MR. ANDERSON:  You should have noticed --
20     MR. FOSTER:  You're not in charge.
21     MR. ANDERSON:  If you wanted a whole day of this
22 deposition --
23     MR. FOSTER:  You're not in charge.
24     MR. ANDERSON:  -- you should have noticed it for a
25 day.  You're entitled to a one-day deposition --

Page 73

1      MR. FOSTER:  No.
2      MR. ANDERSON:  -- up to seven hours, but you did
3  it one day and you noticed two depositions.
4      MR. FOSTER:  I don't know where you practice, but
5  that's not the law.  I'm going to go forward.  I'll let you
6  know, and we'll get on the phone with the judge.  Let's
7  continue.
8  BY MR. FOSTER:
9      Q.  So we just talked about how as a condition to
10 getting the $50,000 Mr. Hoefer was required to sign
11 Exhibits 1 and 2.
12     Do you recall that testimony?
13     A.  Yes.
14     Q.  Do you recall that you and Mr. Shalizi were upset
15 when Mr. Hoefer at your instruction got an attorney
16 involved?
17     A.  Can you react -- or rephrase.
18     Q.  Sure.  Were you upset when Mr. Hoefer had me get
19 involved in this after he was told to have an attorney
20 review the documents?
21     A.  Was I upset for when he got an attorney?
22     Q.  Yeah.
23     A.  No.
24     Q.  Okay.  Do you know whether Mr. Shalizi was upset?
25     A.  I don't know.

**CHRISTOPHER COMSTOCK, VOLUME I**

**May 16, 2024**

Page 74

```
1      Q.  Have you been told that Mr. Shalizi had a phone
2   call with Mr. Hoefer after you guys presented him with
3   these proposals?
4      A.  Yes.
5      Q.  Okay.  And you heard that phone call was recorded;
6   right?
7      A.  I don't recall if it was recorded.
8      Q.  Okay.  You haven't been told that a recording of a
9   phone call has been turned over to your attorneys in this
10  case?
11     A.  I don't recall that it was recorded.
12     Q.  Okay.  You don't recall hearing about that?
13     A.  I don't remember.  No.
14     Q.  Okay.  Well, Mr. Shalizi did have a phone call
15  with Thomas after he was presented with this proposal, and
16  the phone call was recorded by Mr. Hoefer.  And the reason
17  I asked you if you were upset was because didn't you tell
18  Thomas that you were upset that you had heard he had
19  recorded the phone call with Mr. Shalizi?
20     A.  No.
21     Q.  Are you aware that during that phone call
22  Mr. Shalizi told Tom -- told Mr. Hoefer that he had been in
23  control of Marshmello's visual media?
24         MR. ANDERSON:  Objection.  Ambiguous.
25  //
```

Page 75

```
1   BY MR. FOSTER:
2      Q.  Are you aware that Mr. Shalizi told Mr. Hoefer
3   that Mr. Hoefer had been in charge of all of your visual
4   media?
5      A.  I don't know what they said.
6      Q.  Are you aware that Mr. Shalizi told Mr. Hoefer
7   that he was upset that Mr. Hoefer had gotten an attorney
8   involved?
9      A.  No.
10     Q.  If your documents required him to get an attorney
11  involved, should Mr. Shalizi been upset about that?
12     A.  I don't know how he feels.
13     Q.  Would it upset you?
14     A.  It didn't.
15     Q.  Did not?
16     A.  No.
17     Q.  Are you aware that Mr. Shalizi told Mr. Hoefer
18  that the only way that made sense for him to go through
19  with his claims would be if he wasn't planning on being in
20  the industry any longer?
21         MR. ANDERSON:  Mischaracterizes the recording.
22         THE WITNESS:  I don't know what they talked about,
23  specifics.
24  BY MR. FOSTER:
25     Q.  I said would it surprise you if Moe had told him
```

Page 76

```
1   that for Mr. Hoefer to pursue his position he would
2   indicate he didn't plan on being in the industry much
3   longer.  Basically a threat.
4      A.  Would it surprise me?
5      Q.  Yeah.
6      A.  Yes.
7      Q.  Would you have condoned that type of a threat
8   being made?
9          MR. ANDERSON:  Objection.  Mischaracterizes the
10  recording.
11         THE WITNESS:  I wouldn't condone it.
12  BY MR. FOSTER:
13     Q.  Are you aware that Mr. Shalizi told Mr. Hoefer
14  that you, Mr. Comstock, and the company spent millions of
15  dollars on attorneys?
16     A.  No.
17     Q.  Would you have condoned a threat indicating that
18  you spent millions of dollars on attorneys and that
19  Mr. Shalizi telling him that he knew he couldn't afford an
20  attorney?
21     A.  I couldn't condone threats.
22     Q.  Would it surprise you that Mr. Shalizi said those
23  things?
24     A.  Yes.
25     Q.  You certainly didn't instruct him to make those
```

Page 77

```
1   statements, did you?
2      A.  No.
3      Q.  And we have given your attorneys this tape
4   recording.  So this is not something -- this is something
5   you can certainly access if you're interested.  Before you
6   filed your lawsuit -- well, strike that.
7          It sounds like you didn't have a lot of
8   involvement in the preparing of that complaint, the
9   lawsuit, you personally; correct?
10     A.  Correct.
11     Q.  Were you aware that before you filed that lawsuit
12  against Mr. Hoefer that Mr. Hoefer's attorney, me, had made
13  multiple requests to your attorneys to have a sit-down
14  settlement discussion?  Were you aware of that?
15     A.  I don't recall being aware.
16     Q.  Okay.  That on three or four occasions, I
17  personally proposed that we hire, like, a neutral mediator
18  to sit down with the parties and try to come to some
19  resolution.
20         Were you aware that I had been asking for that?
21     A.  I don't recall.
22         MR. ANDERSON:  Well, I'm going to caution you to
23  exclude all communications that you had with your lawyers,
24  either me or Josh.
25         MR. FOSTER:  Okay.  Well, I'm just asking you
```

**Page 78**

1 whether you were aware of something, and it sounds like you
2 were not aware it.
3        MR. ANDERSON:  And, again, excluding information
4 you obtained from your lawyers.
5        MR. FOSTER:  Okay.
6 BY MR. FOSTER:
7    Q.  So -- and so for several months, me, on behalf
8 Mr. Hoefer, was trying to schedule a sit-down meeting with
9 you -- or you didn't have to be there -- and your attorneys
10 to try to figure out how we could resolve this thing
11 peacefully.  And during the middle of my repeated request
12 to have a sit-down meeting, you filed a lawsuit.  Right in
13 the middle of me trying to set up a sit-down peacemaking
14 meeting, a lawsuit was filed.
15        MR. ANDERSON:  Objection.  That's absolutely
16 false.  You were threatening to sue.
17        MR. FOSTER:  Are you going to speak?  Are you
18 going to save it for cross-examination?  Are you going to
19 speak?  You're too seasoned to do that.
20        MR. ANDERSON:  I object --
21        MR. FOSTER:  You're better than that.
22        MR. ANDERSON:  -- object.  It is argumentative and
23 lacks foundation.
24        MR. FOSTER:  Okay.
25    //

**Page 79**

1 BY MR. FOSTER:
2    Q.  Okay.  So would you have preferred to sit down and
3 try to resolve this thing before a lawsuit was filed?
4        MR. ANDERSON:  Objection.
5        MR. FOSTER:  What?
6        MR. ANDERSON:  How is this relevant?
7        MR. FOSTER:  Common sense.
8        (Unreportable simultaneous talking.)
9        MR. ANDERSON:  (Indiscernible) -- settlement
10 discussions.
11        MR. FOSTER:  Now, you're --
12        (Unreportable simultaneous talking.)
13        MR. FOSTER:  You're chewing up my time.
14        MR. ANDERSON:  How is it relevant to any of the
15 claims in the complaint, any --
16        MR. FOSTER:  Okay.
17        MR. ANDERSON:  -- of the defenses?  And you never
18 did file a counterclaim.  So how --
19        MR. FOSTER:  Are you almost done?  Okay.  No more
20 speaking --
21        (Unreportable simultaneous talking.)
22        MR. ANDERSON:  Explain to me -- explain to me --
23        (Unreportable simultaneous talking.)
24        MR. FOSTER:  I want you to note this -- mark
25 this --

**Page 80**

1        MR. ANDERSON:  I want you to mark this whole
2 stuff.  This whole portion where counsel started asking
3 about settlement discussions.
4        (Transcript marked at the request of counsels.)
5        MR. FOSTER:  So back to this.  Back so to this.
6 BY MR. FOSTER:
7    Q.  So in the middle of my requesting a settlement
8 meeting that you were not aware of; right?
9    A.  Ask it again.
10    Q.  Sir, you were not aware that before the lawsuit
11 was filed that I had made multiple requests to have a
12 settlement meeting; is that correct?
13    A.  I don't recall right now.
14    Q.  Okay.  If you had known that Mr. Hoefer wanted to
15 sit down and try to resolve things before we both spent a
16 bunch of money and you got brought in here for a
17 deposition, would you have wanted to sit down and at least
18 try to work something out?
19    A.  No.
20    Q.  You would not have wanted to?
21    A.  No.
22    Q.  Under no circumstances?
23    A.  No.  No.  No.
24    Q.  Okay.  So are you aware that if the judge rules in
25 favor of Mr. Hoefer that Mr. Hoefer will own rights to a

**Page 81**

1 significant amount of your intellectual property that you
2 now claim you own?  Do you realize that this could have a
3 devastating impact on your companies?
4        MR. FOSTER:  I'd appreciate you not laughing.
5 The question was do you realize that.
6        MR. ANDERSON:  I don't know how you're going to --
7        (Unreportable simultaneous talking.)
8        MR. FOSTER:  Do you -- do you -- are you going to
9 object?
10        MR. ANDERSON:  I object.
11        MR. FOSTER:  Form or foundation?
12        MR. ANDERSON:  I object to the extent that --
13        MR. FOSTER:  Form or foundation.
14        MR. ANDERSON:  I object to the extent you're
15 calling for attorney/client communications and ask the
16 witness to the exclude from his answer --
17        MR. FOSTER:  Okay.  No.  No.  No.
18        MR. ANDERSON:  -- any attorney/client
19 communications.
20 BY MR. FOSTER:
21    Q.  Do you realize that if you lose on your claim,
22 that Mr. Hoefer will be awarded a significant amount of
23 what you consider your intellectual property?
24        MR. ANDERSON:  Objection.  Lacks foundation --
25        MR. FOSTER:  Do you realize that?

Page 82

1       MR. ANDERSON: -- to the extent it calls for a
2   legal conclusion and --
3       MR. FOSTER: Don't.
4       MR. ANDERSON: -- it's argumentative.
5       MR. FOSTER: Do you realize that?
6       THE WITNESS: Do I answer that?
7       MR. FOSTER: Yes.
8       MR. ANDERSON: If you understand the question
9   subject to --
10      (Unreportable simultaneous talking.)
11      THE COURT REPORTER: One at a time, please. One
12  at a time.
13      MR. FOSTER: I'm going to ask it again, and this
14  time you made your objection. It's noted.
15  BY MR. FOSTER:
16      Q. Do you realize that if you lose on this claim that
17  at lot of the intellectual property that you believe you
18  and your companies own will be owned by Mr. Hoefer?
19      Do you realize that?
20      A. I don't realize any specifics.
21      Q. Do you understand that, though?
22      A. Are you telling me that just happened or do I
23  understand it? No.
24      Q. So you don't understand that you might actually be
25  hurt by the outcome of this case?

Page 83

1       A. I understand that.
2       Q. Okay. And -- and that would mean that Mr. Hoefer
3   owned all of the creative works that he created.
4       Would that impact you and your businesses?
5       MR. ANDERSON: Objection. Argumentative. Lacks
6   foundation.
7       THE WITNESS: Can you rephrase it?
8   BY MR. FOSTER:
9       Q. Sure. If Mr. Hoefer owned all the visual media
10  and other stuff that he was the creative creator behind and
11  the media that was used at your productions, would that
12  have an impact on your business?
13      MR. ANDERSON: Objection. It is argumentative.
14  BY MR. FOSTER:
15      Q. Would that have an impact on your business?
16      A. I'm not sure.
17      MR. ANDERSON: Objection. Lacks foundation --
18      MR. FOSTER: Okay.
19      MR. ANDERSON: -- argumentative, and this whole
20  line of questioning is completely irrelevant, and I ask
21  that the court reporter -- actually, during a break if you
22  can identify the portions --
23      (Unreportable simultaneous talking.)
24      MR. FOSTER: You want something marked? I already
25  had this marked with your objections, so...

Page 84

1   BY MR. FOSTER:
2       Q. Do you recall a time when Mr. Hoefer became upset
3   at you for you telling him that he was sleeping with an
4   ugly woman?
5       THE VIDEOGRAPHER: I'm sorry. The audio went out.
6   Can you re-ask that?
7       MR. BINDER: The audio is out. We're on pause.
8       THE VIDEOGRAPHER: Oh, no. We're not on pause.
9       MR. FOSTER: Oh, tell me, please. Come on.
10      (Unreportable simultaneous talking.)
11      THE VIDEOGRAPHER: I just said if you can re-ask
12  it.
13      MR. FOSTER: Come on. All right.
14  BY MR. FOSTER:
15      Q. So do you recall Mr. Hoefer getting upset with you
16  for you teasing him about him sleeping with ugly women?
17      A. I don't recall. No.
18      Q. You don't recall that causing some type of a rift?
19      A. I don't recall.
20      Q. Do you recall having a discussion with Mr. Shalizi
21  about that?
22      A. I don't recall.
23      Q. "Chris was telling me how ugly the girl I slept
24  with in Miami was, and I just felt insulted. The -- I got
25  into my blood. Just felt small."

Page 85

1       Do you recall Mr. Hoefer telling you that?
2       A. No.
3       Q. Do you recall teasing him about an unattractive
4   woman he slept with in Miami?
5       A. No.
6       Q. Would that have been something -- would it
7   surprise you if did if you've been drinking?
8       A. I mean, we banter, but I don't recall.
9       Q. Okay. Would you think that would be appropriate
10  to tease Mr. Hoefer about sleeping with an unattractive or
11  fat woman?
12      A. We all tease each other.
13      Q. But you don't recall in that instance that it
14  really irritated Mr. Hoefer?
15      A. I don't recall.
16      Q. You're not denying you've made those statements,
17  are you?
18      A. I don't recall making them at all.
19      Q. But you're not denying making those statements?
20      A. I'm confused on the difference.
21      Q. You're not a hundred percent sure you didn't say
22  that; correct?
23      A. No.
24      Q. Is it true that you only had about three
25  rehearsals in the last seven years?

**CHRISTOPHER COMSTOCK, VOLUME I**

**May 16, 2024**

Page 86

1    A.  I don't recall how many rehearsals I had.

2    Q.  Can you think of any more than three?  You know

3    what a rehearsal is; right?

4    A.  There's so many types of different rehearsals.

5    There's sound checks.  There's rehearsal -- what are you

6    referring to?

7    Q.  Like a full show; isn't that a rehearsal?

8    A.  Yes.  I'm confused on the --

9    Q.  Well, can you think of any full-show rehearsals?

10   Can you think of a single one?

11   A.  Yes.

12   Q.  Okay.  Can you think of more than one?

13   A.  I can recall one, definitely.

14   Q.  Where was that one?

15   A.  Microsoft Theater, rehearsing for Lollapalooza.

16   Q.  Who was your current VJ now?

17   A.  His name is Kendall.

18   Q.  What's the last name?

19   A.  I can't remember his last name.

20   Q.  Kendall?

21   A.  (Inaudible response.)

22   Q.  Is he an employee or a contractor?

23   A.  I'm not sure.

24   Q.  How long has he worked with you?

25   A.  I don't know the exact amount of time.  Within the

Page 87

1    last year.

2    Q.  Okay.

3    A.  Within a year.  I don't remember specifics.

4    Q.  Was -- was he hired shortly after Thomas was let

5    go?  Because Thomas was let go in, like, July.  So that's

6    not even a year.

7       That's ten months ago, whatever; right?

8    A.  Shortly after Thomas was let go, yes.

9    Q.  Okay.  Did you hire him or who hired him?

10   A.  It would have been Moe.

11   Q.  Okay.  How's he do?

12   A.  Good.

13   Q.  Now, the -- when you guys traveled, did you --

14   your team, did you fly together or did you fly separate

15   from the group when you traveled?

16   A.  We flew together.

17   Q.  Okay.  Did you guys fly coach or private or...

18   A.  Both.

19   Q.  Both?

20   A.  (Inaudible response.)

21   Q.  During the -- well, strike that.

22      When Mr. Hoefer was filed -- fired he had been

23   with you for about seven or eight years; right?

24   A.  Yes.

25   Q.  And is it true that the only person on your team

Page 88

1    who had been with you longer than him was Mr. Shalizi?

2    A.  Yes.

3    Q.  Okay.  So he was the second-longest tenured person

4    on your core team; is that right?

5       MR. ANDERSON:  Objection.  Ambiguous.

6       THE WITNESS:  I believe so, yes.

7    BY MR. FOSTER:

8    Q.  Now, the entire time that Mr. Hoefer worked with

9    you, he would also be doing VJ and other work for other

10   performers when he wasn't touring with you; correct?

11   A.  Correct.

12   Q.  You know, your only requirement was that your

13   shows be given top priority?  Fair?

14   A.  That's fair.

15   Q.  Is it true that with respect to the space that

16   Mr. Hoefer worked in the visual media and working with

17   animators and doing the things he did that it was not

18   necessary for you to have a lot of direct involvement in

19   that?

20   A.  Can you rephrase it?  Repeat it.

21   Q.  Sure.  You and Mr. Hoefer didn't work together

22   very much in the last few years; correct?

23   A.  I don't recall.

24   Q.  Okay.  Well, that's a fair statement.

25      You guys didn't collaborate and work together one

Page 89

1    on one hardly at all in the last three or four years.

2       Is that a correct statement?

3    A.  I don't recall.

4    Q.  Do you recall that you didn't have a lot of

5    interaction with Mr. Hoefer with regard to the projects he

6    was working on in the last three or four years?

7    A.  I don't recall, and I don't really understand

8    projects he was working on.

9    Q.  Well, that's my point.

10      You weren't involved in the projects he was

11   working on, you personally; is that correct?

12      MR. ANDERSON:  Argumentative.

13      THE WITNESS:  I don't understand.

14   BY MR. FOSTER:

15   Q.  Well, you understand who you are, don't ya?

16   A.  Yeah.

17   Q.  So you, Chris Comstock, Mr. Comstock, were not

18   working closely with Mr. Hoefer on the projects he was

19   working on --

20      MR. ANDERSON:  Objection.  Argumentative --

21      MR. FOSTER:  -- correct?

22      MR. ANDERSON:  -- and vague.

23      THE WITNESS:  Who are the projects?  What

24   projects?

25   //

Page 90

BY MR. FOSTER:

2    Q. Any projects.

3    A. No.

4    Q. You were not, were you?

5    A. I'm confused.

6    Q. Okay. I'm trying to break it down as simple as I

7 can. I'm not trying to trick you.

8    I'm saying you, Chris Comstock --

9    A. Mm-hmm.

10    Q. -- didn't have a lot of contact with Mr. Hoefer

11 about the projects he was working on; correct?

12    MR. ANDERSON: Same objections.

13    THE WITNESS: I don't -- I feel like there's so

14 many projects. I don't know what -- I don't understand the

15 question.

16 BY MR. FOSTER:

17    Q. Okay. You know that Mr. Hoefer worked with

18 animators; right?

19    A. Yes.

20    Q. Okay. When Mr. Hoefer was working with different

21 animators, were you part of the e-mail chains with

22 Mr. Hoefer and these animators? Were you on the phone

23 conversations with Mr. Hoefer and these animators?

24    A. I don't recall.

25    Q. Okay. Can you think of any time in the last three

Page 91

1 years where you have been involved?

2    A. I can't recall specifics.

3    Q. Okay. So that's a yes-or-no answer.

4    Can you think of any time in the last three years

5 where you've been involved with Mr. Hoefer in his work with

6 animators?

7    MR. ANDERSON: Objection. Vague.

8    THE WITNESS: Can I think and remember, no.

9 BY MR. FOSTER:

10    Q. Okay. Can you think of any time in the last three

11 or four years where you've been involved with Mr. Hoefer in

12 his -- preparing for his --

13    MR. FOSTER: Oh, well, hold on.

14    (Brief pause in proceedings.)

15 BY MR. FOSTER:

16    Q. It's true, isn't it, Mr. Comstock, that you

17 focused on your music and Mr. Hoefer focused on his

18 projects and that you didn't spend a lot of time working

19 with Mr. Hoefer on his projects?

20    MR. ANDERSON: Objection. Vague and ambiguous.

21    THE WITNESS: I don't understand the projects.

22 BY MR. FOSTER:

23    Q. Okay. Well, what kind of projects did Mr. Hoefer

24 work on?

25    A. I don't recall.

Page 92

1    Q. Okay. So my point is you were not -- you don't

2 even know what projects he was working on?

3    MR. ANDERSON: You're assuming he did.

4    (Unreportable simultaneous talking.)

5    MR. FOSTER: Don't speak. Don't speak. I'm not

6 assuming you did anything.

7 BY MR. FOSTER:

8    Q. I'm asking you whether or not -- well, strike

9 that.

10    One of the things Mr. Hoefer did was work with

11 animators; right?

12    A. I remember he introduced us to one.

13    Q. Okay. And is that all you know about his work

14 with animators?

15    A. Yes.

16    Q. Okay. Would it surprise you if I told you that

17 Mr. Hoefer worked extensively with a number of different

18 animators?

19    A. Yes.

20    Q. Okay. If Mr. Hoefer worked extensively with a

21 number of different animators, would that indicate that you

22 didn't really know what he was doing?

23    A. I don't understand the question.

24    Q. Well, don't look to your attorney all the time,

25 please.

Page 93

1    MR. ANDERSON: Well, he hasn't looked at me all

2 the time. He looked at me that time in frustration.

3    MR. FOSTER: He's -- he's done it about ten times

4 in the last five minutes, so...

5    THE WITNESS: I'll look that way.

6    (Unreportable simultaneous talking.)

7    MR. FOSTER: That would be better because he's not

8 going to bail you out. You have to answer the questions.

9 BY MR. FOSTER:

10    Q. Did you didn't have a lot of e-mails or text

11 messages with Mr. Hoefer in the last three or four years,

12 did ya?

13    MR. ANDERSON: Objection. Vague.

14    THE WITNESS: I'm -- I don't recall.

15 BY MR. FOSTER:

16    Q. You don't know one way or the other?

17    A. I don't recall the amount of texts and e-mails I

18 have.

19    Q. Okay. Do you recall whether you received very

20 few?

21    A. I don't recall.

22    Q. Do you have a lot of text messages and e-mails

23 with Moe?

24    A. Yes.

25    Q. Do you have a lot of texts and e-mails with some

Page 94

1  of your family members, for example?
2      A.  Yeah.
3      Q.  Okay.  Do you, as you sit here today, recall that
4  you haven't had a lot of texts or e-mails with Mr. Hoefer
5  in the last four or five years?
6      A.  I don't recall.  We talked when he was working for
7  me.
8      Q.  Okay.  That's not what I asked you.  I asked you
9  about texts and e-mails.  I'm sure you talked to him.
10     A.  We talked.
11     Q.  It's true that you didn't have a lot of
12  texts or e-mails with Mr. Hoefer; correct?
13     A.  I don't remember it being a lot or a little or any
14  specifics of how many texts.
15     Q.  Okay.
16     A.  I don't recall.
17     Q.  It was very infrequent.
18         Is that fair?
19     A.  I don't recall.
20     Q.  Okay.  Did you produce your texts and e-mails to
21  your attorney as requested by us in this case?
22         MR. ANDERSON:  Objection.  Argumentative.
23         THE WITNESS:  I don't recall.
24  BY MR. FOSTER:
25     Q.  Okay.  Well, who would know?  It's your -- your

Page 95

1  cell phone.
2         Who would know if you gave your attorney text
3  messages if it wasn't you?
4      A.  Maybe Josh --
5      Q.  Okay.
6      A.  -- Binder.
7      Q.  Okay.  I'd like to make a demand for his
8  production of his texts and e-mails if they haven't already
9  been produced.
10         MR. ANDERSON:  There was a review for texts and
11  e-mails that related to this lawsuit, and we're within the
12  request for production.
13         MR. FOSTER:  Okay.
14         MR. ANDERSON:  The fact they had unrelated texts,
15  of course, is not within the request.
16         MR. FOSTER:  Okay.
17  BY MR. FOSTER:
18     Q.  Is it fair to say that you don't recall one way or
19  the other whether you worked with Mr. Hoefer on any of the
20  work he was doing?
21     A.  I don't recall.  It's a confusing question.
22     Q.  You don't recall one way or another.  As you sit
23  here now --
24     A.  Yeah.
25     Q.  -- can you think of any project that Mr. Hoefer

Page 96

1  has been involved with for your companies?
2      A.  No.
3      Q.  You can't think of anything offhand?
4      A.  No.
5      Q.  Okay.  Is it fair to say that you don't know what
6  many of the people working for your company are doing?
7      A.  That's not fair to say, no.
8      Q.  Well, it's fair to say you don't know what
9  Mr. Hoefer was doing; correct?
10         MR. ANDERSON:  Objection.  Argumentative.
11         THE WITNESS:  Can you rephrase it?
12  BY MR. FOSTER:
13     Q.  Sure.  It's fair to say that you don't know what
14  Mr. Hoefer was working on?
15         MR. ANDERSON:  Same objection.
16  BY MR. FOSTER:
17     Q.  Is that fair to say?
18     A.  I still don't understand the question.
19     Q.  Well, you just testified you can't think of a
20  single project Mr. Hoefer was working on.
21         You just said that; right?
22     A.  Right.
23     Q.  So is it fair to say that you don't know what
24  Mr. Hoefer was doing for your company other than VJ'ing?
25     A.  Yes.

Page 97

1      Q.  Okay.  How does your company use -- well, strike
2  that.
3         Does your company have videos of you performing on
4  stage, like an entire concert or an entire show?
5      A.  I don't understand that question.
6      Q.  Yeah.  Do you record your performances?
7      A.  Yes.
8      Q.  Okay.  What do you guys do with those?
9      A.  We review them after the shows.  Think about what
10  went wrong, what went different, what could we do
11  different.
12     Q.  Okay.  Do you sometimes post them on social media?
13  YouTube or, you know, whatever else.
14     A.  I post videos of my performances, yeah.
15     Q.  Okay.  Do you do that or do you have people who do
16  that for you?
17     A.  I have people do it for me.
18     Q.  Okay.  Do you post videos of most of your
19  performances?
20     A.  No.  It just depends.
21     Q.  Okay.  Do you post videos of many of your
22  performances?
23     A.  Yeah.
24     Q.  I mean, that helps drive ticket sales, I assume;
25  right?

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 98

1    A. I'm not sure.
2    Q. Well, you -- why -- okay.
3       Do you think it hurts your ticket sales by posting
4  videos?
5    A. If it does bad, maybe. I don't know. I can't say
6  that it affects ticket sales. I'm not sure.
7    Q. Well, the purpose of posting your videos is to
8  promote Marshmello, your brand, your shows; right?
9    A. Yes.
10   Q. When I see in e-mails and text messages language
11 in there about Tommy adding his secret sauce, what is that
12 referring to?
13   A. I have no idea.
14   Q. Well, it's terms that are used by, you know, Moe
15 and other people. You've never heard anybody refer to
16 that?
17   A. No.
18   Q. Or Tommy's magic.
19      Have you heard of that?
20   A. No.
21   Q. Okay. Do you know why other people would be
22 referring to what Tommy did during live performances as
23 Tommy's magic?
24   A. No.
25   Q. You've never heard that phrase before?

Page 99

1    A. Never.
2    Q. Did you have any role at all in Mr. Hoefer --
3  strike that.
4       Your current VJ, does he use his own equipment, if
5  you know?
6    A. I'm not sure.
7    Q. Are you aware that Mr. Hoefer's last offer to
8  settle the case was $250,000?
9       MR. ANDERSON: Wait. Wait. To the extent he has
10 that information, if it's information he obtained through
11 counsel, so I instruct him not to answer. It's
12 attorney/client privilege.
13      BY MR. FOSTER:
14   Q. Are you aware that in an effort to avoid these
15 depositions the last few days Mr. Hoefer lowered his
16 settlement offer to $250,000?
17      MR. ANDERSON: Same objection. Unless you head
18 that from some source other than your lawyers.
19      BY MR. FOSTER:
20   Q. Do you know whether -- has anybody told you that
21 that offer was made?
22      MR. ANDERSON: Same objection.
23      MR. FOSTER: No. No.
24      MR. ANDERSON: Excluding attorneys. Excluding
25 attorneys.

Page 100

1    BY MR. FOSTER:
2    Q. Has anybody told you that a settlement offer was
3  made three days ago?
4    A. No.
5       MR. ANDERSON: Excluding -- excluding
6  attorney/client communications.
7       MR. FOSTER: He's already answered.
8       MR. ANDERSON: Yeah. Excludeing attorney/client
9  communications.
10      THE WITNESS: Excluding them, yeah.
11      BY MR. FOSTER:
12   Q. Did you know that? The goal was to try to resolve
13 this thing so we didn't end up wasting everybody's time and
14 money. We never received a response to the written
15 settlement offer.
16      So Steven Macauley, he handles a lot of your taxes
17 and financial stuff?
18   A. Steven Macauley, yes.
19   Q. Okay. Have you been told that Mr. Hoefer is going
20 to file copyright applications if we don't get this case
21 settled?
22      MR. ANDERSON: Excluding anything you heard from
23 your attorneys, which is attorney/client privileged --
24      (Unreportable simultaneous talking.)
25      MR. FOSTER: Are you --

Page 101

1       MR. ANDERSON: -- and to the extent it's
2  attorney/client privileged, I instruct you not to answer.
3       BY MR. FOSTER:
4    Q. Are you aware that Mr. Hoefer has held off filing
5  copyright applications so that we can try to get this case
6  settled?
7       MR. ANDERSON: Oh, God.
8       MR. FOSTER: Are you aware of that?
9       MR. ANDERSON: Same -- same instruction. And also
10 it's false, but...
11      BY MR. FOSTER:
12   Q. Are you aware of that?
13   A. I have to answer?
14      MR. ANDERSON: No.
15      (Unreportable simultaneous talking.)
16      MR. ANDERSON: You're instructed not to answer
17 except to the extent you've heard what's he's claiming that
18 was said --
19      (Unreportable simultaneous talking.)
20      THE WITNESS: (Indiscernible.)
21      THE COURT REPORTER: Repeat that.
22      THE WITNESS: I said, no.
23      BY MR. FOSTER:
24   Q. Are you aware that Mr. Hoefer hadn't responded to
25 media inquires about this lawsuit so that we could

**Page 102**

1  potentially reach a settlement without getting other people
2  involved?
3      **A.  I don't know.  No.**
4      Q.  Are you aware of who owns the intellectual
5  property of your companies?
6      **A.  I don't know anything about that.  No.**
7      Q.  Yeah.  I just meant -- well, let me ask you.
8          Do you know what -- there -- there are two
9  different plaintiffs.  There's Marshmello Creative and
10  there's 365 Touring.
11         What does Marshmello Creative do?
12     **A.  I don't know any of the back end stuff.  Moe would**
13  **know all that.**
14     Q.  Okay.  And do you know what 365 Touring does?
15     **A.  Not specifically, no.**
16     Q.  Do you -- do you know which of those two legal
17  entities, 365 Touring or Marshmello Creative, owns any
18  intellectual property that involves the Marshmello brand?
19     **A.  I don't know about anything -- anything like that.**
20  **I don't know how it all works.**
21     Q.  Would that be a Josh Binder question?
22     **A.  Or Moe.**
23     Q.  Or Moe?
24         MR. BINDER:  It's Binder.
25         **THE WITNESS:  Binder.**

**Page 103**

1          MR. FOSTER:  What's that?
2          **THE WITNESS:  Binder.**
3          MR. BINDER:  It's Binder.
4          MR. FOSTER:  Oh, I'm sorry, I'm not doing that on
5  purpose.
6          **THE WITNESS:  Binder or Moe Shalizi.**
7          MR. FOSTER:  Yeah.
8  BY MR. FOSTER:
9      Q.  So I'm confused.  Who -- who do you think was the
10  employee -- I'm sorry.  Strike that.
11         Who do you believe was the employer of Mr. Hoefer,
12  which company?
13     **A.  I'm not sure.  I don't know anything about that.**
14     Q.  Okay.  Well, in 2015 Mr. Hoefer received a
15  year-end tax statement from Marshmello Creative indicating
16  that Marshmello Creative was paying Mr. Hoefer.  In 2017
17  Mr. Hoefer received a 1099 statement at the end of the year
18  indicating that 365 Touring was paying him that year, and
19  then from 2018 until 2023, we just found out that a company
20  called Touring, Inc. has been sending W-2 statements to
21  Mr. Hoefer indicating that it is Mr. Hoefer's employer.
22         So we've got Marshmello Creative in 2015.  All
23  right.  I'm sorry, in 2016.  We've got 365 Touring 2017,
24  and then we got some company we just learned about called
25  Touring, Inc. from 2018 to 2023.

**Page 104**

1      Q.  Do you have any idea who, you, as the plaintiff in
2  this lawsuit, claim is Mr. Hoefer's employer?
3      **A.  I don't know.  No.**
4      Q.  Can you -- can you see why it might be confusing
5  to Mr. Hoefer with the involvement of three or four
6  different companies issuing him statements indicating that
7  they were paying him?
8      **A.  I'm not sure how he feels, but I don't know**
9  **either.**
10     Q.  Would you be confused by that?
11     **A.  I just -- I'm not -- I don't know.  I don't know**
12  **about it.**
13     Q.  Have you had any prior disputes with former
14  employees?
15     **A.  Not that I can recall.**
16     Q.  Yeah.  I'm talking about lawsuits.  I'm talking
17  about, you know, letters from attorneys or, you know,
18  things that happened.  Not everything results in a lawsuit.
19         Do you understand that?
20     **A.  Yes.**
21     Q.  Okay.  And as you sit here can you think of other
22  issues you've had with employees of your companies?
23     **A.  I don't recall any.**
24     Q.  Do you know a Jen Ramirez?
25     **A.  Name's familiar but I don't remember specifically.**

**Page 105**

1  No.
2      Q.  You can't recall?
3      **A.  I can't recall.**
4      Q.  Who is Clark Coss?
5      **A.  He is my production manager.**
6      Q.  How long has he been with you?
7      **A.  About six years.**
8      Q.  Do you recall that when Mr. Hoefer left your --
9  your companies that he provided access to all of his visual
10  media that he had created?
11     **A.  I don't understand the question.**
12     Q.  Sure.  When Mr. Hoefer left, you continued to have
13  access to the visual media that he created while he was
14  working with you guys?
15     **A.  I don't know anything about that.**
16     Q.  Okay.  Who was Travis Domm?
17     **A.  I don't know.**
18         MR. ANDERSON:  Okay.  Counsel, it's now
19  1:00 o'clock.  Unless you agree that you're done, I'm
20  adjourning the deposition, and if we don't get this
21  resolved, I'll seek a protection order.  You noticed this
22  for 9:30, and you noticed a separate deposition for
23  1:00 o'clock in the afternoon.  You changed the time to
24  10:30, giving you less time, and I'm not going to
25  (indiscernible) the record.  I have to get back to my

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

Page 106

1   office so that we can proceed with the Rule 30(b)(6)
2   deposition.
3          MR. FOSTER: Okay. And before you leave I'm
4   giving you a couple of options. One -- one, we conclude
5   Mr. Comstock's deposition. I think I used about, you know,
6   two hours of my seven-hour allotted time. Two, we take a
7   break and begin Mr. Shalizi's deposition if, in fact, you
8   can make Mr. Comstock available Friday or Monday to
9   complete his deposition.
10         MR. ANDERSON: We're going by the notices that you
11  served, and you've amended them to provide that the
12  Rule 30(b)(6) deposition starts in half an hour. It's by
13  Zoom. I have to get back to my office, and I made my
14  position very clear in both our e-mail exchanges and on the
15  record today.
16         MR. FOSTER: So you're unwilling to agree to bring
17  Mr. Comstock back to conclude his deposition. Is that your
18  position?
19         MR. ANDERSON: You know my position.
20         MR. FOSTER: Is that -- no. No.
21         MR. ANDERSON: You know my position.
22         (Unreportable simultaneous talking.)
23         MR. ANDERSON: You know my position. I got to get
24  back for the 1:30 deposition.
25         MR. FOSTER: No. No. It's my deposition.

Page 107

1          MR. ANDERSON: This deposition is adjourned.
2          MR. FOSTER: So you're unwilling to commit
3   Mr. Comstock to continue his deposition at any later date?
4          MR. ANDERSON: Madam Court Reporter, can you
5   please note that we adjourned the deposition and we're
6   leaving.
7          MR. FOSTER: Okay. We'll seek sanctions. Thank
8   you, and we'll get the judge on before the 1:30 depo.
9          MR. ANDERSON: Well, you're not going to have time
10  because I'll in the car.
11         MR. FOSTER: Well, I'll call you at 1:30 then.
12         (Counsel Anderson, Counsel Binder, and
13          Mr. Comstock adjourned the deposition.)
14         THE VIDEOGRAPHER: Are we going off the record?
15         MR. FOSTER: Yeah.
16         THE VIDEOGRAPHER: The time is 1:01 p.m. We're
17  off the record.
18         (Deposition adjourned at 1:01 p.m.)
19
20                       *    *    *
21
22
23
24
25

Page 108

1          I, JESSICA LOBATO, CSR No. 14478, certify:  that
2   the forgoing proceedings were taken before me at the time
3   and place herein set forth; at which time the witness was
4   duly sworn; and that the transcript is a true record of the
5   testimony so given.
6
7          Witness review, correction and signature was
8   ( )by code.                    ( )requested.
9   ( )waived.                     (X)not requested.
10  ( )Not handled by the deposition officer due to party
11  stipulation.
12
13         The dismantling, unsealing, or unbinding of the
14  original transcript will render the reporter's certificate
15  null and void.
16         I further certify that I am not financially
17  interested in the action, and I am not a relative or
18  employee of any attorney of the parties, nor of any of the
19  parties.
20         Date this 20th day of May, 2024.
21
22
23                    *Jessica Lobato*
                      _____
24                    Jessica Lobato, CSR 14478
25

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

**Exhibits**

**Exhibit 1**
4:11 46:8,10
47:4,13,16
49:13

**Exhibit 2**
4:12 46:9,11
47:5,14 52:17

**$**

**$20,000**
42:24

**$250,000**
99:8,16

**$50,000**
47:22 48:1,10,
21 49:5,9,15
52:19 53:23
56:3 73:10

**$6,000**
35:9

**$8,000**
35:14,21

**-**

**--O0O--**
6:4

**1**

**1**
45:14 46:3,8,
10 47:4,12,13,
16,21 48:1,25
49:13,15
51:14 73:11

**101**
9:17

**1099**
103:17

**10:30**
68:22 69:1
105:24

**10:40**
6:3,11

**10:45**
11:5

**10:48**
11:8

**11**
54:12,14,23
55:1

**11:35**
46:22,24

**11:42**
46:24,25

**12**
67:1

**12:00**
64:18

**12:06**
66:13,15

**12:09**
66:15,16

**14478**
7:6

**15**
70:8

**16**
6:2

**16th**
6:11

**1992**
10:21

**19th**
10:21

**1:00**
65:8,12,19
68:21 69:14
70:10,21
105:19,23

**1:01**
107:16,18

**1:30**
65:3,9,12,13,
19 66:23
69:15 71:4,15
106:24 107:8,
11

**2**

**2**
45:14 46:9,11
47:4,5,12,14,
22 48:1,25
52:17 54:5
73:11

**2014**
12:21 18:4

**2015**
21:10 103:14,
22

**2016**
15:25 103:23

**2017**
35:8 103:16,
23

**2018**
35:13,22 36:5
103:19,25

**2023**
20:1 21:10
36:5 37:25
48:5 63:10
103:19,25

**2024**
6:2,11

**22**
13:14 14:6,25

**2:00**
65:3

**2:23-cv-7345**
6:8

**3**

**3**
54:12

**30(b)(6)**
64:19,24 65:8,
9,19,23 66:24
69:14 71:5,23
106:1,12

**31**
10:19 11:15

**350**
6:9

**365**
19:10 25:23
26:7 53:3,22
102:10,14,17
103:18,23

**4**

**4**
50:18

**401K**
30:4

**45**
23:24

**5**

**5**
63:10

**50**
48:15

**50,000**
56:1

**5:00**
31:8

**6**

**6,000**
35:17

**8**

**8,000**
35:18

**8:00**
31:8

**9**

**9:00**
31:8

**9:28**
66:5

**9:30**
67:5 68:20,23,
25 105:22

**A**

**A-R-T-I-E**
19:5

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

A-R-T-Y
19:7

a.m.
6:3,11 11:8
46:22,24,25
67:5

abide
33:20

ability
15:23

absolutely
45:23 78:15

access
77:5 105:9,13

accommodate
67:6

account
18:23

accounting
14:15,16

accuracy
25:6

accurate
10:10 24:25
25:10

acknowledging
24:24 25:9
54:23

act
38:1

acting
37:14 38:8
39:2 43:23
44:16

add
66:9

adding
98:11

adjourn
70:10,24

adjourned
107:1,5,13,18

adjourning
105:20

affect
39:23

affecting
37:15

affects
40:1,2 98:6

afford
76:19

afternoon
69:1 105:23

age
11:15 13:6

agency
18:10,12,18

agent
18:7,9,10,13

agents
18:20

aggressively
27:8

agree
19:16,19,21
21:24 22:1,2,
4,6,9,13 23:8
45:24 46:5
49:18 53:21
70:9,22
105:19 106:16

agreed

38:18

agreement
9:9 26:18
27:22 28:3
29:20 32:7,14
45:15,16 46:8
47:5,14,15,17
50:6 52:20
54:16

agreements
29:5 32:2,5
45:10 56:13

ahead
38:21 67:17

allotted
106:6

allowed
66:21 67:7

amazing
22:15

ambiguous
58:3 61:8
74:24 88:5
91:20

amended
106:11

amount
32:23 35:2,6,
13 56:1 81:1,
22 86:25
93:17

Anderson
6:21 9:20
20:22 21:1
23:15 24:3,7
26:19,22 27:3,
6,8,14,16
28:16 33:2,7,
10,13,15 34:1,

6,10,12,20,23
38:21 41:15,
23,25 42:2,11
45:3,7,17,19
46:1,6,12
49:23 51:2,23
52:5 55:20
57:15,21 58:3,
9,13,19 59:2,
13,22 60:8,20
61:8 62:15,21,
24 63:2 64:14,
18 65:7,11,15,
18 66:4,7,10
67:13,17 68:3,
6,9,13,19,23,
25 69:7,10,13,
19,22,24 70:1,
3,8,13,15,17,
19,24 71:2,4,
7,11,13,19,25
72:4,8,19,21,
24 73:2 74:24
75:21 76:9
77:22 78:3,15,
20,22 79:4,6,
9,14,17,22
80:1 81:6,10,
12,14,18,24
82:1,4,8 83:5,
13,17,19 88:5
89:12,20,22
90:12 91:7,20
92:3 93:1,13
94:22 95:10,
14 96:10,15
99:9,17,22,24
100:5,8,22
101:1,7,9,14,
16 105:18
106:10,19,21,
23 107:1,4,9,
12

Anderson's
58:2 59:7

Angeles
6:1,9,14 9:4

animators
36:23 37:8
88:17 90:18,
21,22,23 91:6
92:11,14,18,
21

anymore
37:21 38:11

apparently
65:25

appearing
31:20

applications
100:20 101:5

approved
48:17

areas
67:1

argumentative
20:22 33:3
41:23,25 42:1,
11 51:4 64:14
78:22 82:4
83:5,13,19
89:12,20
94:22 96:10

Arizona
31:13

artist
8:22

Arty
8:23 19:5

assign
51:18

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

assigned
32:8

assigning
50:24

assistant
66:2

associate
46:4 65:5

Associates
31:4

assume
10:2 33:23
63:17 97:24

Assumes
20:22

assuming
92:3,6

attend
12:4

attention
40:3

attitude
72:12

attorney
6:18 13:17
25:5 26:2
27:11 41:15
54:9,17,21,24
56:2,5,8 57:7
58:1 73:15,19,
21 75:7,10
76:20 77:12
92:24 94:21
95:2

attorney/client
24:3 58:5
81:15,18
99:12 100:6,8,
23 101:2

attorneys
23:15 24:13
25:12 63:12
67:20 72:10
74:9 76:15,18
77:3,13 78:9
99:24,25
100:23 104:17

attraction
22:11

audio
84:5,7

August
48:5

automate
22:23

Avenue
6:9

avoid
99:14

awarded
81:22

aware
16:18 19:9
28:10 32:7
35:10 41:5,9
42:19 47:20,
25 48:3,4 49:4
51:21 52:2,10
57:5 64:8
74:21 75:2,6,
17 76:13
77:11,14,15,
20 78:1,2
80:8,10,24
99:7,14 101:4,
8,12,24 102:4

---

**B**

B-I
17:5

B-U
17:7

b-u-y
17:9

B-U-Y-G-O-R-E
17:6

back
11:9 14:17
18:7,11 34:6,
24 41:10
42:13,17
44:18 47:1
48:4 55:24
63:8,9 65:20
66:17 69:15
80:5 102:12
105:25
106:13,17,24

background
55:10

backup
23:1,4

bad
98:5

bail
93:8

ball
56:11

band
15:5,8,11

bands
15:3

banter
85:8

basically
37:1,6 43:4
50:10 51:14
76:3

basis
32:16,19

beat-up
41:13

began
32:15,22,25
35:2,6,21

begin
106:7

beginning
6:6,17 20:23
21:21 35:21
39:13

behalf
6:10,13,20,22,
24 60:2 78:7

benefits
29:25

big
14:17 15:5,16
22:7 61:6,11,
13,14,15

Binder
6:23,24 13:18,
20 14:3 23:16
57:13 58:1
60:1 66:9 84:7
95:6 102:21,
24,25 103:2,3,
6 107:12

birth
10:20

blanking
19:3

blood
84:25

blowing
44:10 68:11

body
42:5

bother
53:22

brand
20:10 21:25
22:3,5 98:8
102:18

Brand-
43:10

Brandon
29:1 38:13,14,
16 40:25 41:5
43:13 53:4

Brandon's
43:10

break
15:16,17,21
25:4 46:24
47:11 65:2
83:21 90:6
106:7

Brian
6:19 7:18

briefly
7:19 19:4

bring
106:16

brought
80:16

bug
39:21

build
21:25 22:3

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

42:5

**building**
20:10 22:4

**bunch**
41:13,22
80:16

**business**
12:12,15,17
14:16 30:10,
13,17 37:19
83:12,15

**businesses**
83:4

**Buygore**
17:3,16,25

**C**

**California**
6:1,9,14 7:4
11:19 27:12

**call**
16:24 19:5
24:13 52:20
63:12 74:2,5,
9,14,16,19,21
107:11

**called**
7:10 12:12
43:13,15
103:20,24

**calling**
44:11,17
81:15

**calls**
28:16 41:15
51:4 58:4
60:8,20 62:15
82:1

**camera**
10:25 11:3

**Canada**
39:5

**capacity**
64:25

**caption**
63:6,12

**car**
107:10

**care**
46:18

**career**
36:13

**carefully**
25:8 54:16

**case**
6:8 8:2,9,14,
17,19 9:4
24:15,18 25:7
32:9 53:1
56:14,23 62:3
74:10 82:25
94:21 99:8
100:20 101:5

**caused**
37:12

**causing**
84:18

**caution**
77:22

**cell**
65:24 95:1

**Certified**
7:4

**cetera**
50:7 56:1

**chains**
90:21

**chance**
40:19

**change**
26:20 27:9

**changed**
65:8 69:1
105:23

**charge**
72:18,20,23
75:3

**checks**
86:5

**chewing**
79:13

**children**
16:21

**choice**
67:7 71:15

**choose**
15:21

**Chris**
11:12 19:10
39:25 84:23
89:17 90:8

**Christopher**
6:7,24 7:9,17
63:14 64:9

**Circle**
18:11

**circumstances**
80:22

**city**
12:1

**claim**
81:2,21 82:16

104:2

**claiming**
101:17

**claims**
53:1,2,6 75:19
79:15

**Clark**
29:3 105:4

**classic**
15:12

**clean**
10:6

**clear**
39:17 40:6
48:20 106:14

**client**
41:16 45:6
56:11,13
61:14

**closely**
89:18

**coach**
33:14 34:17
87:17

**coaching**
33:6 34:15,20

**code**
7:6

**collaborate**
88:25

**college**
12:7,17 13:15,
16 14:23

**commit**
107:2

**Common**
79:7

**communication**
57:6

**communications**
41:16 58:5,6
77:23 81:15,
19 100:6,9

**companies**
8:7 28:23 30:8
31:11,14
36:20 50:12
51:16,18 64:9
81:3 82:18
96:1 102:5
104:6,22
105:9

**company**
16:9,25 17:14
26:6 28:7
30:18,19 31:1,
2,3 49:20
63:16 64:1
76:14 96:6,24
97:1,3 103:12,
19,24

**competitor**
16:22

**complaint**
58:25 60:4
62:14 63:10,
11 77:8 79:15

**complete**
66:21 67:8,14
68:9 69:2
72:16 106:9

**completed**
66:23 67:23
72:6

**completely**

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

9:3 22:1,4
83:20

**compliant**
7:6

**computer**
9:6 43:6
69:18,21,25
70:13

**computers**
41:14,22
42:10,21,25
43:4 70:4

**Comstock**
6:7,25 7:9,17,
18 11:11,12
19:11 47:3,11
50:3 55:5
63:9,14 64:9
66:20 76:14
89:17 90:8
91:16 106:8,
17 107:3,13

**Comstock's**
65:1,2 67:8
69:3 106:5

**concern**
65:22

**concert**
97:4

**conclude**
106:4,17

**conclusion**
51:4 64:25
82:2

**condition**
73:9

**condone**
76:11,21

**condoned**
76:7,17

**confidential**
49:16 50:6,11
51:15

**confidentiality**
32:2 45:15
46:8 47:4,13,
16 50:16

**confused**
85:20 86:8
90:5 103:9
104:10

**confusing**
51:13 95:21
104:4

**consecutively**
45:20

**considered**
19:22

**consulted**
54:9

**contact**
14:3 57:11
90:10

**contained**
52:11

**continue**
72:5,13 73:7
107:3

**continued**
105:12

**contract**
18:2 25:17
26:6

**contractor**
26:15 28:3
86:22

**contractors**
32:2

**contracts**
29:6

**contrary**
67:9

**contributions**
30:4

**control**
72:13 74:23

**controlling**
64:1

**controversy**
16:16

**conversation**
42:19

**conversational**
10:8

**conversations**
57:10 90:23

**convicted**
10:22 11:16

**copies**
46:12

**copyright**
32:8 100:20
101:5

**copyrights**
13:23 14:2
51:18 56:12

**core**
88:4

**correct**
11:16,17
13:18,19
25:18 27:19,
22,23 31:24,

25 32:16,23
33:1 36:17
41:1 45:11
48:22,25 49:1
56:7,9 59:1,
15,19,20,23,
24 60:3 61:3,5
77:9,10 80:12
85:22 88:10,
11,22 89:2,11,
21 90:11
94:12 96:9

**Coss**
29:3 105:4

**counsel**
33:7 45:1
46:18 47:6
64:18 66:24
67:17 80:2
99:11 105:18
107:12

**counsels**
80:4

**counterclaim**
79:18

**couple**
25:2 43:6
45:10 50:1
57:5 106:4

**court**
6:12 7:1,3
10:6 33:15
34:8 46:15,17
62:3 71:11,17
82:11 83:21
101:21 107:4

**courtroom**
8:12

**COVID**
9:6

**CPA**
30:9

**crap**
26:25

**created**
22:9 51:19
83:3 105:10,
13

**creating**
10:5

**creative**
6:7 19:10
25:21 26:6
53:3,22 63:16,
18,20 64:7
83:3,10 102:9,
11,17 103:15,
16,22

**creator**
83:10

**crimes**
10:22

**cross-
examination**
78:18

**crushed**
67:19

**CSR**
7:6

**current**
86:16 99:4

**D**

**dark**
23:6

**data**
22:20

CHRISTOPHER COMSTOCK, VOLUME I

date
10:20 107:3

dated
63:10

David
31:3

Davis
6:22

day
15:7 40:3 65:8
72:1,3,21,25
73:3

days
69:5 99:15
100:3

deal
61:7,11,13,14,
15

debate
42:2

decide
41:20,24 42:8

decided
42:12

decision
9:8 48:9,14,21

defendants'
46:10,11 47:3

defenses
79:17

degree
12:11 15:1

demand
95:7

denying
85:16,19

depends

61:12 97:20

depo
66:21 107:8

deponent
66:24

deponents
66:24

depos
72:13

deposed
9:15

deposition
6:6,10,15 7:5,
19,22 8:11,13
9:16,17 11:11
23:13 25:14
26:1 34:17
45:14 62:4,6
64:19,25 65:6,
8,19,23 66:20,
23 67:2,3,5,8,
11,22,25 68:4,
19,20 69:3,4,
14,16 70:10,
11 71:5,8,23
72:16,22,25
80:17 105:20,
22 106:2,5,7,
9,12,17,24,25
107:1,3,5,13,
18

depositions
6:14 46:2 65:5
66:19 72:5,11
73:3 99:15

designate
18:21

designated
65:24

details
43:24 44:4,6
48:24

devastating
81:3

difference
85:20

dig
25:4

direct
88:18

directly
59:22

director
28:9 29:9,10

disclosure
47:17

discoverable
67:9

discuss
49:19 64:23

discussed
41:16

discussion
77:14 84:20

discussions
79:10 80:3

disputes
104:13

district
33:7,18

divulge
49:19

DJ'ING
13:12

document
24:25 45:14

46:9 52:6,11,
18 53:8,21
54:5 55:21
60:13,16

documents
23:25 24:2,6,
11,15,18,23
25:7,8 47:21
48:5,13,16
49:5,13 51:15,
24 52:13
55:12,13
73:20 75:10

dollars
56:15,23 57:1
76:15,18

Domm
105:16

drinking
85:7

drive
97:24

duly
7:10

DWA
31:3,5

**E**

e-mail
66:4 90:21
106:14

e-mailed
64:23

e-mails
93:10,17,22,
25 94:4,9,12,
20 95:8,11
98:10

earlier
13:18 36:19
62:2

early
21:22

easier
10:11 45:22

eat
65:21

EDM
15:8

effects
22:10

effort
99:14

electronic
15:4,10

employee
26:15,16
27:19 28:25
30:14 86:22
103:10

employees
28:23 29:2,8,
11,25 30:3
32:1 104:14,
22

employer
103:11,21
104:2

employment
25:17 26:18
27:22 29:5,20
50:8

end
100:13 102:12
103:17

ended

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

20:1

energy
22:9

Entertainment
16:2,15

entire
31:10,13 88:8
97:4

entities
102:17

entitled
72:15,25

equally
55:6

equipment
41:14,22
42:10,16,17
99:4

erratic
38:9

erratically
39:2

essentially
36:22

event
14:5

everybody's
100:13

exact
18:16 86:25

examined
7:11

examples
38:5,7

exchanges
106:14

exciting
18:5

exclude
77:23 81:16

Excludeing
100:8

excluding
78:3 99:24
100:5,10,22

excuse
69:13

exhibit
45:20 46:8,9,
10,11 47:4,5,
13,14,16
49:13 52:17
62:25

exhibits
45:14 46:3
47:4,12,21
48:1,25 73:11

existence
14:20

expect
27:11 34:18

explain
34:13 51:13
79:22

explained
54:17

explanation
39:2

expressed
18:1

extensively
92:17,20

extent
58:4 81:12,14

82:1 99:9
101:1,17

_____

**F**

face
56:11 58:21

facet
30:17

fact
95:14 106:7

fair
10:3,12 44:7
55:24 56:1
88:13,14,24
94:18 95:18
96:5,7,8,13,
17,23

falling
37:13

false
27:10 68:9,12
78:16 101:10

falsehood
68:10

familiar
8:14 104:25

family
94:1

fat
85:11

favor
9:9 80:25

feel
20:18 90:13

feelings
20:23 41:2

feels
75:12 104:8

felony
11:16

felt
20:19 84:24,
25

figure
45:25 66:8
78:10

figured
15:5

file
41:12,21 42:8
79:18 100:20

filed
24:16 25:7
42:21 57:23,
24 59:7 60:2,7
61:17,22,25
64:15 77:6,11
78:12,14 79:3
80:11 87:22

filing
41:17 58:25
101:4

finances
30:16

financial
30:21 100:17

find
17:24 60:23,
25

fine
27:15 45:23
65:10 66:12
69:15

finish
68:24 69:12

70:14,16,18,
23 71:3,6,10
72:11

fired
20:20 44:15
45:9 47:20
48:22 49:6
87:22

firm
14:15 30:9
57:12,15 58:2
59:7,22

fit
37:23 38:10,
11

fix
33:22

flew
87:16

flight
39:4,20

flights
39:1,6,7,10
40:5,8,22
44:16

flip
54:12 63:6

fly
87:14,17

focus
47:16

focused
91:17

follow
53:24

forfeit
65:21

forget
18:16

form
27:12 33:5,8,
20 81:11,13

formal
13:3

forward
67:22 73:5

Foster
6:19,20 7:15,
18 11:1,4,10
20:24 21:2,5,
7,9 24:5,9
26:21,23 27:4,
7,10,15,17,18
28:19 33:4,9,
11,14,23 34:3,
9,11,14,17,22,
24 35:1 38:23
41:19,24 42:1,
4,7,14 45:1,5,
8,18,24 46:2,
7,13,16,21
47:2,7,10
49:25 50:3,4
51:5,6 52:1,7,
9 55:22 58:7
59:4,6,14
60:10,22 61:9,
10 62:17,23
63:1,4 64:15,
17,21 65:10,
13,17 66:2,6,
12,18 67:16,
19 68:5,7,11,
16,22,24 69:6,
8,12,18,21,23,
25 70:2,7,12,
14,16,18,23
71:1,3,6,10,
12,18,20,22

72:2,5,9,20,23
73:1,4,8 75:1,
24 76:12
77:25 78:5,6,
17,21,24 79:1,
5,7,11,13,16,
19,24 80:5,6
81:4,8,11,13,
17,20,25 82:3,
5,7,13,15
83:8,14,18,24
84:1,9,13,14
88:7 89:14,21
90:1,16 91:9,
13,15,22 92:5,
7 93:3,7,9,15
94:24 95:13,
16,17 96:12,
16 99:13,19,
23 100:1,7,11,
25 101:3,8,11,
23 103:1,4,7,8
106:3,16,20,
25 107:2,7,11,
15

found
103:19

foundation
27:12 28:16
33:5 78:23
81:11,13,24
83:6,17

Friday
106:8

friend
19:22 20:3
21:14 41:13
42:9 64:13

friends
37:18,21,22
61:18

front
47:18 52:14

frustration
93:2

full
7:16 65:4 86:7

full-show
86:9

fuss
16:21

___

**G**

g-o-r
17:11

g-o-r-e
17:12

game
69:20,22

gave
95:2

general
32:14

generally
50:12 52:23,
25

generous
49:14

Germain
29:1 43:12,13

get along
27:15 41:6
67:20

girl
84:23

give
26:24 38:5

42:12 44:4
64:25

giving
43:24 105:24
106:4

goal
100:12

God
101:7

golden
16:21

good
6:19,21,23 7:3
9:13 10:9
19:19,22 20:3,
14 21:11,14
31:20 37:18,
21 38:11
66:22 87:12

graduate
11:20 12:9,19

graduated
15:1

grand
6:9 48:15

great
20:6,10

gross
35:9

grounds
33:8,17,21
45:21

group
16:8,9,10,16,
17 17:22
87:15

guess
14:5 22:23

34:3 36:24
64:22

guy
18:24 29:10
30:20 38:17

guys
37:17 38:15
43:17 56:3,12,
21 57:10 74:2
87:13,17
88:25 97:8
105:14

___

**H**

half
65:8 72:1,2,17
106:12

half-day
69:3

hand
46:17 47:15
63:8,9

handed
62:23

handing
47:14

handle
13:20 30:20
35:25 40:4
48:7

handles
26:8 28:7
57:25 100:16

happen
45:22 70:6

happened
15:16,18
16:12 35:3

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

37:21 44:16
50:17 52:15
82:22 104:18

**hard**
18:21 44:8

**head**
29:15 39:24
41:10 99:17

**heads**
10:8

**health**
30:1

**hear**
24:10 26:23
33:11,24
34:14 56:2

**heard**
36:25 38:9
51:7 53:8 57:2
74:5,18 98:15,
19,25 100:22
101:17

**hearing**
74:12

**held**
6:8 101:4

**helped**
21:25

**helping**
22:3 23:9

**helps**
97:24

**Hey**
12:14 26:21

**high**
11:20,22 12:4

**hire**
32:5 50:19,24

51:8 77:17
87:9

**hired**
28:11 87:4,9

**Hoefer**
6:8,20 7:20
19:13,16
20:19 21:11
22:13 25:16
26:12,15 28:2
31:6,7,22
32:7,11,15
35:2,5,21
36:2,19 37:3,
12 41:21 42:9,
15,18 43:13,
20 44:1,9,15
45:9 47:20
49:8,13,18
50:7 52:18
53:2,21 54:4,
20 55:4,6,12,
23,25 63:13
64:8 65:6
73:10,15,18
74:2,16,22
75:2,3,6,7,17
76:1,13 77:12
78:8 80:14,25
81:22 82:18
83:2,9 84:2,15
85:1,10,14
87:22 88:8,16,
21 89:5,18
90:10,17,20,
22,23 91:5,11,
17,19,23
92:10,17,20
93:11 94:4,12
95:19,25 96:9,
14,20,24 99:2,
15 100:19
101:4,24

103:11,14,16,
17,21 104:5
105:8,12

**Hoefer's**
56:5 77:12
99:7 103:21
104:2

**hold**
33:4 91:13

**Hollywood**
11:19

**honest**
49:7

**horn**
68:11

**hour**
106:12

**hours**
23:23 31:8,17
65:6 66:21
67:14 69:5
71:24 72:6,17
73:2 106:6

**How's**
87:11

**HR**
28:7,9

**hundred**
85:21

**hundreds**
20:13

**hurt**
82:25

**hurts**
98:3

**I**

**idea**
38:12 41:12,
14,20 98:13
104:1

**identification**
46:10,11

**identify**
6:17 83:22

**imagining**
44:5

**impact**
81:3 83:4,12,
15

**important**
10:7 25:6
65:21 70:20

**inaudible**
86:21 87:20

**include**
50:6

**increase**
35:17,23 36:3,
5

**increased**
35:14 36:13

**independent**
26:15 28:3
32:2 54:17,24

**indicating**
24:17 76:17
103:15,18,21
104:6

**indiscernible**
79:9 101:20
105:25

**individual**
64:25 67:3

**individually**
63:13

**industry**
21:19 75:20
76:2

**information**
25:9 49:16
50:6 67:10,21
78:3 99:10

**infrequent**
94:17

**initial**
54:8,20 55:14

**initially**
17:24 38:16

**inquires**
101:25

**instance**
85:13

**instantly**
23:2

**instruct**
24:4 33:5
41:17 76:25
99:11 101:2

**instructed**
101:16

**instruction**
73:15 101:9

**instructs**
9:20

**insulted**
84:24

**insurance**
30:1

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

intellectual
13:20 14:2
32:8 50:25
51:19 55:25
56:22 57:7
81:1,23 82:17
102:4,18

intelligence
12:12,15

intend
65:12,18

interaction
89:5

interest
7:20 18:2 64:1

interested
77:5

interfere
70:5

internal
28:13

interrupting
69:10,24 70:1

interviewed
14:16

introduced
92:12

inventory
14:1

involved
19:11 48:9,12,
14,16,18,19,
21,24 56:6
61:2 62:3,6
73:16,19 75:8,
11 89:10 91:1,
5,11 96:1
102:2

involvement
58:24,25 59:4
77:8 88:18
104:5

involves
102:18

involving
19:5

irrelevant
83:20

irritated
85:14

issue
11:2 39:5

issues
38:10 104:22

issuing
104:6

**J**

jail
39:18

Jen
104:24

Jessica
6:12 7:4 10:6

job
10:10 20:10,
14 23:5 31:20
36:23 39:22
44:18

Joe's
12:8,20,23
13:1

Josh
13:18 57:13,
18,20,25 58:1

60:1 77:24
95:4 102:21

Joshua
6:23

judge
9:8 26:23
72:11 73:6
80:24 107:8

July
48:5 87:5

**K**

Kendall
86:17,20

kick
23:2

kids
10:16 11:15

kind
8:2 9:17 11:24
16:19 25:4,17
26:5 28:14,20
29:6,23 30:21
37:14 60:14
61:6 91:23

kinds
24:20 56:12

knew
56:20 64:11
76:19

knowledge
25:16

KPMG
14:12

Krasner
6:13

**L**

labeled
49:15

lacks
28:16 78:23
81:24 83:5,17

language
16:20 44:14
98:10

laser
29:10

laughing
81:4

law
57:12 73:5

lawsuit
8:23 19:4
41:12,17,21
42:9,16,21
53:16 57:23,
24 58:2 59:8,
21 60:2,5
61:3,6,11,13,
22,25 64:15
77:6,9,11
78:12,14 79:3
80:10 95:11
101:25 104:2,
18

lawsuits
19:10 61:18
62:5 104:16

lawyer
9:20 53:10
55:14,15,23
58:6 59:25

lawyers
14:19 23:14

45:11 77:23
78:4 99:18

lead
18:22

learn
58:5 64:12

learned
49:20 51:15
103:24

leave
106:3

leaving
107:6

LED
22:25

left
105:8,12

legal
6:13 51:4
55:6,10,13
82:2 102:16

lengthy
60:13

letter
56:10,21

letters
104:17

letting
38:13

level
55:7

license
7:6

life
45:21 61:3

Light
16:1,5,8,15,

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

17,20,24
17:16

**lighting**
29:9

**lightings**
29:9

**limited**
72:16

**link**
64:20,21
65:25

**litigation**
57:14 72:9

**live**
11:18 22:6
37:9 98:22

**LLC**
6:8

**Lobato**
6:12 7:4

**located**
6:14

**Lollapalooza**
86:15

**long**
8:25 20:15
23:22 30:24
34:19 86:24
105:6

**longer**
71:24 75:20
76:3 88:1

**looked**
24:15 93:1,2

**Los**
6:1,9,14 9:4

**lose**

81:21 82:16

**lot**
10:7 15:17
22:14 24:16
44:4,6 56:22
61:17 67:9
71:24 77:7
82:17 88:18
89:4 90:10
91:18 93:10,
22,25 94:4,11,
13 100:16

**loud**
47:7

**low**
56:11

**lowered**
99:15

___

**M**

**Macauley**
30:12 100:16,
18

**Madam**
107:4

**made**
9:8 15:19
50:19 51:7
52:7 56:3,13
75:18 76:8
77:12 80:11
82:14 85:16
99:21 100:3
106:13

**magic**
36:24 37:9
98:18,23

**majority**
63:17,21,23

64:5

**make**
10:5,10 27:10
39:21 45:17
53:12,16
67:18 72:14
76:25 95:7
106:8

**makes**
45:21

**making**
36:8,16 66:22
85:18,19

**managed**
17:21

**management**
16:8,25

**manager**
26:8,10 27:23,
25 28:6,8,12
29:1,3 30:7,
10,13 40:2,25
43:11 105:5

**managing**
25:20

**mark**
45:13 46:14
62:24 79:24
80:1

**marked**
46:10,11,19
47:11 80:4
83:24,25

**married**
10:14 11:14

**Marshmello**
6:7 19:10 22:3
25:21 26:6
53:3,22 63:16,

18,20 64:7
98:8 102:9,11,
17,18 103:15,
16,22

**Marshmello's**
74:23

**materials**
50:7

**matter**
6:7 16:12

**matters**
55:6

**meaning**
50:16

**means**
50:22,24
51:12 52:23

**meant**
39:18 102:7

**media**
6:6 22:14,20
74:23 75:4
83:9,11 88:16
97:12 101:25
105:10,13

**mediator**
77:17

**meet**
23:12,18,20
57:21,24

**meeting**
25:12 78:8,12,
14 80:8,12

**member**
25:20

**members**
94:1

**memory**
40:17,20,22
62:19

**mentioned**
29:12

**messages**
44:20 93:11,
22 95:3 98:10

**messing**
39:1

**met**
7:19 13:17
43:14 58:8,10,
13,16,20
59:10

**Miami**
84:24 85:4

**mic**
47:6

**Microsoft**
86:15

**mid**
69:1

**middle**
78:11,13 80:7

**million**
39:24 56:14,
23 57:1

**millions**
76:14,18

**mind**
9:18 39:25

**minutes**
23:24 70:9
93:4

**Mis-**
33:2

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

**Mischaracterizes**
51:23 52:5
55:20 59:13
75:21 76:9

**missed**
39:4,7,8,10,12
40:9,11,23

**misses**
39:20

**missing**
39:1 40:5
44:15

**misspoke**
65:18

**misstates**
33:3,24

**mistake**
40:4

**mixture**
38:14

**mm-hmm**
10:8 14:18,21
19:1 53:5
55:17 90:9

**Moe**
17:3,14,19,24
18:1 26:11
28:13 30:7
53:4 67:4
75:25 87:10
93:23 98:14
102:12,22,23
103:6

**Mohr**
6:24

**moment**
46:20

**Monday**
72:15 106:8

**money**
36:8,16 53:11,
13,15 80:16
100:14

**month**
35:6,9,14,21

**monthly**
32:23 35:2

**months**
57:6 78:7 87:7

**morning**
6:19,21,23 7:3
67:5

**mouth**
27:12

**move**
33:10,18
69:14

**moved**
16:9,15 17:16

**moving**
16:17 25:4

**multiple**
18:20 69:5
77:13 80:11

**music**
13:8 15:4,6,
10,19 91:17

**musical**
8:22 13:3

**musician**
50:21

**N**

**Name's**

104:25

**named**
15:19 18:24

**nano**
39:25

**narrowly**
51:3

**nature**
13:4,11

**necessarily**
22:19

**needed**
55:13

**neutral**
77:17

**nice**
15:1

**night**
64:23

**nod**
10:8

**non-disclosure**
45:15 47:5,13

**non-music**
14:22

**nonplussed**
72:11

**note**
79:24 107:5

**noted**
82:14

**notice**
72:2

**noticed**
65:7 66:19
67:3 68:19,23,
25 69:3 71:25

72:19,24 73:3
105:21,22

**notices**
106:10

**noticing**
6:17

**number**
6:6 7:6 40:10
45:16 56:17
92:17,21

**numbered**
45:20

**numbers**
35:19

**O**

**object**
33:8,20 38:21
45:21 46:6
58:4 78:20,22
81:9,10,12,14

**objection**
20:22 24:3
26:19 33:18
34:9,13 41:15,
23,25 42:11
51:2,23 52:5
55:20 58:3
59:2 60:20
61:8 64:14
74:24 76:9
78:15 79:4
81:24 82:14
83:5,13,17
88:5 89:20
91:7,20 93:13
94:22 96:10,
15 99:17,22

**objections**

26:24 27:2
33:5 42:2
83:25 90:12

**observation**
45:17

**obtained**
50:8 78:4
99:10

**occasions**
77:16

**offer**
33:19 47:22
48:2,10,21
56:3,13,14,18
99:7,16,21
100:2,15

**offered**
34:2 49:9
56:23

**offhand**
96:3

**office**
69:15 70:5,8,
11 106:1,13

**officer**
7:5

**one-day**
72:25

**open**
65:2 71:11
72:15

**opinion**
26:14

**options**
106:4

**order**
49:14 52:19
105:21

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

originally
32:15 35:8

outcome
82:25

owed
56:22

owned
57:7 82:18
83:3,9

owner
63:17,21,23
64:5

owns
55:25 56:12
102:4,17

oxymoron
12:14

**P**

p.m.
66:13,15,16
107:16,18

pages
63:6

paid
32:11,16,19,
22 35:6,8,21

papers
24:16 28:14

paperwork
28:13 29:6,23
32:4,6,10 48:7
52:13,16 55:4
64:2

paragraph
49:15,16
50:18 51:14,
17 54:12,14,

23 55:1

part
22:2,7,11,12
23:9 39:22
47:22 48:1,10
49:5 53:24
90:21

participate
69:16

parties
9:9 13:12
77:18

parting
43:17

party
8:21 54:16

pause
11:7 66:15
84:7,8 91:14

pay
35:23 36:3,5
48:9,14 53:11,
15

paying
35:2 40:3
103:16,18
104:7

payout
52:19

peacefully
78:11

peacemaking
78:13

people
15:17 28:11
55:24 56:10
61:18 96:6
97:15,17
98:15,21

102:1

people's
44:13

percent
85:21

performance
32:16,19
39:21

performances
22:6 31:20,23
37:9 39:8,11,
12,15 97:6,14,
19,22 98:22

performed
36:24

performers
88:10

performing
13:6,8,10 97:3

period
20:9 21:13
22:21 32:18

person
10:7 18:22
26:5 28:20
31:24 58:10
59:11 66:25
87:25 88:3

personal
41:2 58:24
59:4

personally
8:6 64:8 77:9,
17 89:11

Peter
6:21 59:22
69:9

Philadelphia

11:23 12:8

Philly
12:1,2

phone
24:13 26:25
43:16,17,23
44:10 58:22
59:12 73:6
74:1,5,9,14,
16,19,21
90:22 95:1

phrase
98:25

piano
13:8

pick
63:5

picks
43:16

pieces
42:21

place
46:4

plaintiff
6:10 63:14
104:1

plaintiffs
6:22 25:18
32:9 102:9

plan
64:19,22 76:2

planning
75:19

play
69:19,22

played
13:13

playing
15:3

plugging
22:20

point
15:21 16:10
32:21 35:3,18
45:9 53:20
56:5 57:11
64:12 70:21
89:9 92:1

pointed
69:2

pointing
27:3

popular
23:9

portfolio
13:21

portion
80:2

portions
83:22

position
14:22 72:12
76:1 106:14,
18,19,21,23

post
97:12,14,18,
21

posting
98:3,7

potentially
102:1

practice
73:4

preferred
79:2

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

prep
23:22

prepare
23:12

prepared
26:1

preparing
59:21 77:8
91:12

present
6:16

presented
38:12 45:10
47:21 48:1,6
49:4 56:18,19
74:2,15

pretty
15:20 18:5
21:22 25:6
47:7 60:13

previously
59:12

prices
43:3

prior
33:25 104:13

priority
88:13

prison
39:13,18

private
15:1 87:17

privilege
24:4 27:13
99:12

privileged
100:23 101:2

problems
10:25

proceed
9:21 106:1

proceedings
11:7 91:14

produce
45:1 94:20

produced
71:14 95:9

producing
15:6,9

production
29:3 95:8,12
105:5

productions
83:11

professional
37:15

progress
66:22

project
95:25 96:20

projecting
22:24 23:2

projects
89:5,8,10,18,
23,24 90:2,11,
14 91:18,19,
21,23 92:2

promote
98:8

property
13:21 14:2
32:8 50:25
51:19 55:25
56:22 57:8
81:1,23 82:17

102:5,18

proposal
67:24 68:17
74:15

proposals
74:3

propose
72:14

proposed
77:17

proposing
64:24

protection
105:21

provide
106:11

provided
105:9

provisions
52:11

purchased
43:5

purpose
98:7 103:5

purposes
50:5

pursue
76:1

put
16:20 22:15
65:3

putting
26:25 58:2

___

**Q**

question

9:7,21,22,25
10:2 20:11
21:1 26:17
27:16 31:12
33:22 34:7,21
36:1 37:2
44:12 49:7
58:17 59:5
60:24 65:11
70:2 81:5 82:8
90:15 92:23
95:21 96:18
97:5 102:21
105:11

questioning
66:18 83:20

questions
9:19 34:25
67:13 70:20
71:16 93:8

quick
26:25

___

**R**

Ramirez
104:24

ran
22:16

re-ask
84:6,11

reach
102:1

reached
9:9 18:1

react
73:17

read
24:24 34:6,8
49:23 51:11

54:16 67:13
69:7

reads
50:5

ready
25:13 27:14

realize
81:2,5,21,25
82:5,16,19,20

reason
74:16

recall
16:18,23 18:9
20:7 24:22,23
25:1 28:1
32:17,18 35:3,
11,15,16,17,
19 36:12
40:10 43:22,
25 44:3,24
56:4 57:22
58:9,15 59:12
60:6,9,12,17
61:20,23 62:1,
7,9,16 63:3,7
64:6,16 73:12,
14 74:7,11,12
77:15,21
80:13 84:2,15,
17,18,19,20,
22 85:1,3,8,
13,15,18 86:1,
13 88:23 89:3,
4,7 90:24
91:2,25 93:14,
17,19,21 94:3,
6,16,19,23
95:18,21,22
104:15,23
105:2,3,8

recalled

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

35:5

**receive**
35:22 49:14

**received**
12:25 50:11
55:4,12 64:19
66:1 67:23
93:19 100:14
103:14,17

**receiving**
32:25

**recitals**
13:8

**record**
6:5,16 10:6,25
11:3,6,9 27:10
34:8 46:19,23
47:1 48:20
52:8 66:10,14,
17 71:13 97:6
105:25 106:15
107:14,17

**record's**
39:17

**recorded**
74:5,7,11,16,
19

**recording**
74:8 75:21
76:10 77:4

**recover**
41:13,21
42:10

**Red**
16:1,5,8,15,
16,20,24
17:16

**refer**
11:12 98:15

**referred**
36:25

**referring**
39:4 86:6
98:12,22

**refresh**
62:19

**regard**
89:5

**regarded**
21:18

**rehearsal**
86:3,5,7

**rehearsals**
85:25 86:1,4,9

**rehearsing**
86:15

**related**
95:11

**release**
45:16 46:9
47:14 49:10
52:20,23,25
53:2,6,17,20

**releasing**
53:1

**relevant**
67:21 79:6,14

**remember**
8:8 9:1,10
13:14 14:8
16:3 18:3,21
19:2 24:20
40:12,15
56:16,17
60:14,15
74:13 86:19
87:3 91:8
92:12 94:13

104:25

**remembered**
44:1

**remind**
50:23

**remotely**
31:10,12,13
67:6,7,25

**repeat**
37:2 88:20
101:21

**repeated**
78:11

**repeating**
71:12

**rephrase**
21:8 44:12
53:14 73:17
83:7 88:20
96:11

**replaced**
20:15

**reporter**
6:12 7:1,3,5,7
10:6 33:16
34:8 46:15,17
82:11 83:21
101:21 107:4

**reporting**
30:21

**representing**
7:19

**represents**
54:16

**request**
33:1 67:6
78:11 80:4
95:12,15

**requested**
94:21

**requesting**
80:7

**requests**
77:13 80:11

**required**
33:18 49:14,
18 50:10,15
51:14,22
52:18 53:21
54:5,8,20
73:10 75:10

**requirement**
88:12

**requires**
51:17

**reroute**
40:4

**resolution**
77:19

**resolve**
78:10 79:3
80:15 100:12

**resolved**
105:21

**respect**
88:15

**responded**
55:24 56:2
101:24

**response**
86:21 87:20
100:14

**responsible**
22:24

**rest**
37:15

**restrictive**
16:19

**results**
104:18

**resume**
66:18

**resuming**
65:2

**retain**
43:7

**retainer**
32:22,24 33:1
34:12

**return**
70:11

**review**
73:20 95:10
97:9

**reviewed**
24:17,18,21,
23 25:8 50:11

**rid**
38:17

**rift**
84:18

**rights**
32:9 50:25
56:1 80:25

**rock**
15:4

**rock-and-roll**
15:12

**role**
99:2

**Rothenberg**
6:24

**roughly**

15:24

**rule**
69:4,7,14 71:5
106:1,12

**rules**
66:21 80:24

**running**
22:17

**rush**
65:5

**S**

**Saint**
12:8,19,23
13:1

**salary**
32:24 34:10
35:4

**sales**
97:24 98:3,6

**Sam**
18:24,25

**Samantha**
6:13

**sanctionable**
68:10,12

**sanctions**
107:7

**satisfied**
67:23

**sauce**
98:11

**save**
78:18

**schedule**
78:8

**scheduled**
66:23 67:4,6
68:1

**school**
11:20,22,23,
24,25 12:4,5
15:1

**schooling**
12:22

**Scott**
29:10

**screen**
22:25 23:2,6
69:17

**seasoned**
78:19

**second-
longest**
88:3

**seconds**
25:3

**secret**
98:11

**seek**
105:21 107:7

**seeking**
42:17

**send**
56:10

**sending**
103:20

**sense**
75:18 79:7

**sentence**
43:25

**sentences**
50:1 51:12

**separate**
20:18 68:20
87:14 105:22

**September**
63:10

**series**
9:19

**served**
106:11

**service**
52:20 65:24

**set**
31:8,17 35:6
78:13

**settle**
8:14 53:16
56:14,23 99:8

**settled**
100:21 101:6

**settlement**
49:10 57:7
77:14 79:9
80:3,7,12
99:16 100:2,
15 102:1

**seven-hour**
106:6

**seven-year**
41:13 42:9
61:18

**severance**
47:22 48:2,10,
18,19 49:15
52:19

**Shalizi**
16:5,8,10,16,
17 17:3,22,24
26:11 28:13
42:16 64:24

65:3 67:4,24
68:4 71:8
72:14 73:14,
24 74:1,14,19,
22 75:2,6,11,
17 76:13,19,
22 84:20 88:1
103:6

**Shalizi's**
67:6 71:23
106:7

**shareholder**
25:23

**Shipley**
11:23,25 12:1

**short**
67:11

**Shorthand**
7:4

**shortly**
87:4,8

**show**
8:12 22:11,12
25:2 40:3
45:13 86:7
97:4

**showed**
37:8 62:22

**showing**
7:20 47:3

**shown**
22:14,22

**shows**
20:13 22:5,15,
16,24 36:24
37:7 39:1
88:13 97:9
98:8

**shuffles**
28:14

**shut**
27:12

**sic**
6:10 29:9

**sign**
49:5,9,14
50:15 51:21
52:2,10,19
53:17 73:10

**signature**
25:9

**signed**
16:1,25 17:25
18:2,9 28:14
32:3 56:13

**significant**
25:23 81:1,22

**signing**
24:23 25:6
54:9

**simple**
90:6

**simultaneous**
17:4 27:5
34:5,16 38:20
59:3 65:16
67:12 68:15,
18 71:21 79:8,
12,21,23 81:7
82:10 83:23
84:10 92:4
93:6 100:24
101:15,19
106:22

**single**
86:10 96:20

**sir**

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

68:13 80:10

**sit**
19:9 38:24
60:15 61:24
77:18 79:2
80:15,17 94:3
95:22 104:21

**sit-down**
77:13 78:8,12,
13

**skipped**
50:9

**slap**
56:11

**sleeping**
84:3,16 85:10

**slept**
84:23 85:4

**small**
54:5,6 84:25

**social**
97:12

**solves**
65:22

**song**
15:19

**sound**
43:2 86:5

**sounds**
19:15 35:11
77:7 78:1

**source**
99:18

**South**
6:9

**space**
88:15

**speak**
78:17,19 92:5

**speaking**
26:24 27:2
33:4 79:20

**specialized**
12:25

**specific**
22:24 35:19
38:7 43:3,25
51:9

**specifically**
13:14 14:8
16:3 20:7 25:1
52:12 102:15
104:25

**specificity**
14:10

**specifics**
8:8 9:10 35:11
40:15 44:24
62:1 75:23
82:20 87:3
91:2 94:14

**speculation**
28:17 60:8,20
62:15

**spend**
91:18

**spent**
76:14,18
80:15

**spoken**
54:21,24
58:19,22
59:11

**stage**
14:9 22:10
97:4

**stages**
21:22

**staring**
27:6

**start**
7:22 13:6,7,11
14:12 21:7
44:10,17 47:8
65:19,23
68:20 71:4

**started**
13:8,13 14:25
15:9 16:9 38:1
66:3 80:2

**starting**
71:15

**starts**
106:12

**state**
7:16 33:8,17,
21

**statement**
67:18 88:24
89:2 103:15,
17

**statements**
77:1 85:16,19
103:20 104:6

**statistics**
12:13,16

**sternly**
26:20

**Steven**
30:12 100:16,
18

**stipulate**
33:19

**stipulation**

34:1

**stop**
33:13,15
65:20 68:6,11
69:10,24 70:1,
9,13,15

**stopping**
65:9

**strike**
26:13 41:4
43:9 49:2 61:1
77:6 87:21
92:8 97:1 99:3
103:10

**strongly**
70:19

**study**
12:16

**stuff**
13:23 15:11
24:17,25
28:15,20
30:22 31:19
37:19 43:6
46:4 80:2
83:10 100:17
102:12

**subject**
82:9

**subpoena**
68:4,7 71:14

**subpoenaed**
71:7

**suburbs**
12:2

**sue**
8:4 53:12,18
78:16

**sued**
14:19 26:5

**sufficiency**
67:2

**sufficient**
19:21 20:8
33:20

**suggest**
70:19

**suing**
8:4,5,6 61:25
63:13 64:8,12

**summer**
18:4

**suppose**
20:16

**surprise**
35:20 36:3
44:2 55:5
75:25 76:4,22
85:7 92:16

**surprised**
35:24

**surprising**
35:23

**surprisingly**
66:25

**suspend**
65:17

**SVW(MRWX)**
6:8

**swear**
7:2

**sworn**
7:10 26:4

# T

**taking**
65:2 72:12

**Talent**
18:12

**talented**
21:16

**talk**
24:2 28:11
40:19 47:7
50:16

**talked**
19:4 27:24
73:9 75:22
94:6,9,10

**talking**
14:14 17:4
27:5 33:16
34:5,16 38:20
59:3 65:16
67:12 68:15,
18 71:21 79:8,
12,21,23 81:7
82:10 83:23
84:10 92:4
93:6 100:24
101:15,19
104:16 106:22

**tape**
77:3

**tasked**
31:19

**tax**
103:15

**taxes**
30:21 100:16

**team**
22:3 37:15

38:9,11 87:14,
25 88:4

**tease**
85:10,12

**teasing**
84:16 85:3

**Technically**
45:19

**telling**
43:22,23
67:24 76:19
82:22 84:3,23
85:1

**ten**
87:7 93:3

**tenured**
88:3

**term**
8:15 51:7,9

**terms**
59:21 98:14

**test**
40:17

**testified**
7:11 59:10
96:19

**testify**
8:11,12 67:1

**testimony**
26:4,7,8 27:9
33:3,25 37:25
39:7,10 59:13
73:12

**text**
44:20 93:10,
22 95:2 98:10

**texting**
44:10,17

**texts**
93:17,25 94:4,
9,12,14,20
95:8,10,14

**That'd**
18:5

**Theater**
86:15

**thing**
13:7 15:8 37:7
60:14 71:1,22
78:10 79:3
100:13

**things**
10:8 13:11,12
24:20 39:24
51:22 52:3
54:4 71:23
72:6,10 76:23
80:15 88:17
92:10 104:18

**Thomas**
6:8,20 7:20
19:13 40:25
41:6 43:16
64:8 74:15,18
87:4,5,8

**thought**
20:9 21:16
34:13 39:25
62:2

**threat**
76:3,7,17

**threatening**
78:16

**threats**
76:21

**Thursday**
6:2

**ticket**
97:24 98:3,6

**tied**
16:20

**time**
9:16 11:5,8
15:4 16:1,2
18:5 19:23,24,
25 20:9,15
21:13 22:21
27:1 31:10,13
32:18 33:17
38:14 46:22,
25 47:24 48:4
49:23 58:10,
13,16 59:11
65:4 66:13,16
67:14 69:2
70:4,16 79:13
82:11,12,14
84:2 86:25
88:8 90:25
91:4,10,18
92:24 93:2
100:13
105:23,24
106:6 107:9,
16

**time-wise**
16:12

**timeframe**
16:4

**times**
6:15 7:25 93:3

**today**
7:21 13:18
19:9 20:8,18
23:10,15 44:5
60:1,15,19
61:1,24 66:19,
23 68:20

**ticket** ... 71:15 94:3
106:15

**today's**
7:5

**told**
35:20 38:7,15
41:3 42:15
55:13 56:21,
24 64:4,21
65:1 66:2
67:9,10,20
68:5,7 71:8
73:19 74:1,8,
22 75:2,6,17,
25 76:13
92:16 99:20
100:2,19

**Tom**
74:22

**Tommy**
98:11,22

**Tommy's**
36:24 37:9
40:4 98:18,23

**tomorrow**
53:18 66:19
67:5,25 71:8
72:15

**top**
29:14 88:13

**top-notch**
19:17

**topics**
71:16

**tour**
29:1 40:2,25
43:11

**touring**
19:10 25:24

CHRISTOPHER COMSTOCK, VOLUME I

May 16, 2024

26:7 31:15 53:3,22 88:10 102:10,14,17 103:18,20,23, 25

**trademarks**
13:23

**training**
13:1,3

**transactional**
13:17

**transcript**
80:4

**translate**
10:9

**transportation**
40:2

**traveled**
87:13,15

**Travis**
105:16

**Tremaine**
6:22

**tremendous**
56:11

**trial**
8:9,12 40:20

**trick**
90:7

**true**
22:19 41:5,7 72:9 85:24 87:25 88:15 91:16 94:11

**turn**
14:3 53:12,17

**turned**

74:9

**turns**
67:21

**Twitter**
18:1

**type**
49:10 53:8 76:7 84:18

**types**
86:4

---

**U**

**u-y**
17:8

**ugly**
84:4,16,23

**uh-huh**
10:9

**unattractive**
85:3,10

**unaware**
32:10

**Uncertain**
58:4

**undergrad**
14:16

**understand**
9:23,25 10:2 13:22 20:11, 17 21:1 27:1 31:12 45:7 49:7,8 51:10, 12 54:1,2 55:13 59:5,7 60:24 61:2,6 82:8,21,23,24 83:1 89:7,13, 15 90:14

91:21 92:23 96:18 97:5 104:19 105:11

**understanding**
16:7 30:16 40:7

**University**
12:8

**unprofessional**
38:1,2,4,25 39:22

**unrelated**
95:14

**unreportable**
17:4 27:5 34:5,16 38:20 59:3 65:16 67:12 68:15, 18 71:21 79:8, 12,21,23 81:7 82:10 83:23 84:10 92:4 93:6 100:24 101:15,19 106:22

**unwilling**
106:16 107:2

**upset**
73:14,18,21, 24 74:17,18 75:7,11,13 84:2,15

**usual**
69:9

---

**V**

**vague**
58:3 61:8 89:22 91:7,20

93:13

**venue**
13:13

**venues**
13:11

**verification**
24:24

**verified**
24:16

**verifying**
25:6

**versed**
55:6

**video**
6:16 15:19

**videos**
22:14 97:3,14, 18,21 98:4,7

**Vinny**
29:10

**visual**
22:10,14,16 74:23 75:3 83:9 88:16 105:9,13

**visuals**
22:18,25

**VJ**
19:17,18 20:6 21:11,19 36:23 86:16 88:9 99:4

**VJ'D**
37:7,9

**VJ'ING**
96:24

---

**W**

**W-2**
103:20

**W-2S**
28:14

**Wait**
71:2 99:9

**walk**
9:9

**walked**
14:14 44:11

**wanna**
11:1

**wanted**
41:21 42:8 57:1 72:21 80:14,17,20

**wanting**
43:24

**warning**
65:17

**Wass-**
31:1

**Wasser**
18:19

**Wasserman**
18:16,17,18

**waste**
67:14

**wasted**
67:14

**wasting**
70:16 100:13

**waving**
62:21

**CHRISTOPHER COMSTOCK, VOLUME I**

May 16, 2024

**ways**
43:17

**weeks**
67:4 68:1

**weird**
38:1 43:23
44:16

**Weise**
31:3

**wifi**
66:9

**win**
8:19

**Winning**
9:13

**woman**
84:4 85:4,11

**women**
84:16

**won**
9:11

**word**
38:3 55:11

**words**
50:13

**work**
14:22 18:20
21:24 31:7,17
32:5 42:6
50:19,24 51:7
59:22 72:10
80:18 88:9,21,
25 91:5,24
92:10,13
95:20

**worked**
19:13,20
20:12 22:5

30:24 31:6,7,
10,13,14 36:2,
19,23 37:3,7
58:1 60:1
86:24 88:8,16
90:17 92:17,
20 95:19

**working**
14:12 16:5,7
32:15,21
51:16 88:16
89:6,8,11,18,
19 90:11,20
91:18 92:2
94:6 96:6,14,
20 105:14

**works**
53:19 83:3
102:20

**world**
72:7,9

**Wright**
6:22

**written**
25:17 26:5,17
27:21 28:2
29:4,19 45:10
100:14

**wrong**
69:8 97:10

_____

**Y**

_____

**ya**
19:23 23:3
25:21 36:9
89:15 93:12

**year**
12:19 15:24
87:1,3,6

103:17,18

**year-end**
103:15

**years**
9:2,3 11:15
14:25 19:14,
20 20:3,12,20
30:25 31:23
35:22 36:2,8,
14,17,20,22
37:4,6,18
39:15 40:11
43:5,6 49:20
50:12,17
51:17,20
52:20 85:25
87:23 88:22
89:1,6 91:1,4,
11 93:11 94:5
105:7

**yes-or-no**
58:17 62:10
91:3

**yesterday**
23:19 25:13
34:18 45:20
58:11,14,17,
20 59:11 65:6
69:1

**young**
13:6

**younger**
13:9 44:13

**Youtube**
97:13

_____

**Z**

_____

**Zoom**
23:21,22

64:20,21
69:16 70:4
106:13